UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                              )
CITY OF BOSTON,               )
                              )
          Plaintiff,          )
                              )
v.                            )     CIVIL ACTION NO: 03-12415-RWZ
REINAUER TRANSPORTATION       )
COMPANIES, LLC,               )
                              )
          Defendant.          )
_____)

**MEMORANDUM IN SUPPORT OF
<u>CITY OF BOSTON'S MOTION IN LIMINE</u>**

The City of Boston (the "City") hereby moves for an order of this Court that, based upon the facts set forth in the pleadings, the City has established a prima facie case of negligence against the defendant under the authority set forth in *The Oregon*, 158 U.S. 186 (1895) (the "Oregon Rule"), which the defendant must rebut by a preponderance of the evidence, and, further, that the defendant may not rely on authority contained in *The Pennsylvania*, 86 U.S. (19 Wall) 125 (1874) (the "Pennsylvania Rule"), to rebut said presumption of negligence.

<u>BACKGROUND</u>

The City was on December 2, 2000, and is presently, the owner of the Chelsea Street Bridge (the "Bridge"), including the fendering system. At all times relevant to this action, defendant Reinauer Transportation Companies, LLC's ("Reinauer") owned, operated, or controlled the tug DACE REINHAUER and the tank barge RTC-502. Defendant's Answer and Counterclaim, Paragraph 4.

On December 2, 2000, the tank barge RTC-502 and the tug DACE REINAUER were traveling upstream together on the Chelsea River (the "River") in

the vicinity of the Bridge.  Defendant's Answer and Counterclaim, Paragraph 5.  As the tank barge RTC-502 and the tug DACE REINHAUER were transiting the draw of the Bridge, the bow of said tank barge struck and damaged the fendering system of the Bridge on the Chelsea side of the River (the "Allision").  The defendant alleges that its vessels were damaged in this incident and seeks to recover damages for the same.  *Id.,* Counterclaim Paragraphs 7, 8.

The United States Coast Guard issued an Order to Alter dated November 23, 1992 (the "Order to Alter") pursuant to authority under the Truman-Hobbs Act, 33 U.S.C. Sections 511-522.  The Order to Alter, a copy of which is attached hereto as Exhibit 1, required the City to alter the bridge to provide greater vertical and horizontal clearance for transiting vessels.  Reconstruction of the Bridge has not yet occurred.

## ARGUMENT

I. The Applicability of the Presumptions Established by the Supreme Court in The Oregon and The Pennsylvania are Ripe for Decision.

The City's claim against Reinauer is that it failed to exercise reasonable care in the operation and control of the tug DACE REINAUER, and as a result of the defendant's negligence, the tank barge RTC-502 struck the fendering system of the Bridge and caused damage to the structure.

Both the Oregon Rule and the Pennsylvania Rule, set forth below, operate to shift the burden of proof with respect to evidence of liability.  The issues presented for decision in this motion extend no further than the initial application of the Oregon Rule and the Pennsylvania Rule in this case.  The City does not seek in this motion a final determination of whether the quantum of proof required to rebut either presumption has been met, only whether the presumptions attach.  Such a

determination is a question of law.  *See, e.g., Union Pacific v. Kirby Inland Marine*, 296 F.3d 671 (8th Cir. 2002).

   II.   The Oregon Rule Should be Applied to the Defendant.

      A.   The Oregon Rule.

"The rule is well settled that when a vessel under its own power collides with an anchored vessel or a navigational structure, the burden of proving absence of fault or *vis major* rests on the pilot vessel." *City of Boston v. S.S. Texaco Texas*, 773 F.2d 1396, 1398 (1985), *citing The Oregon*, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1894), *The Virginia Ehrman*, 7 Otto (97 U.S.) 309, 315, 24 L.Ed. 890 (1877), *The Clarita*, 23 Wall (90 U.S.) 1, 13, 23 L. Ed. 146 (1874), *James v. River Parishes Co., Inc.*, 686 F.2d 1129, 1132 (5th Cir. 1982), *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 794-95 (5th Cir. 1977); *Carr v. Hermosa Amusement Corp. Ltd.*, 137 F.2d 983 (9th Cir. 1943).  The presumption of fault applied to a moving vessel that strikes a stationary object, under the Oregon Rule, "[u]ltimately . . . derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way." *American Petrofina Pipeline v. M/V Shoko Maru*, 837 F.2d 1324, 1326 (5th Cir. 1988).

The fact that the tank barge RTC-502 was not under its own power, and was assisted through the draw of the Bridge at the time of the allision by the tug DACE REINAUER, does not alter the application of the presumption of fault against the defendant.  For example, "[i]t is well established that 'a vessel which drifts into collision is presumed to be at fault until the contrary is made to appear[.]'" *James v. River Parishes Co., Inc.*, 686 F.2d at 1131-1132, *citing Compania de Navigacion v. S/S American Oriole*, 474 F. Supp. 22, 27 (E.D. La. 1976), *aff'd on basis of district*

*court opinion*, 585 F.2d 1326 (5th Cir. 1978). The presumption of fault that attaches to a drifting vessel that strikes a stationary object is referred to as the Louisiana Rule.[1] The practical result is the same, and the term the Oregon Rule is used herein for consistency.

The contact in this case between the tank barge RTC-502 and the Bridge constituted an allision sufficient to invoke the Oregon Rule. *American Petrofina Pipeline v. M/V Shoko Maru*, 837 F.2d at 1326.

### B. Application of the Oregon Rule to the Defendant Shifts to the Defendant the Burden of Disproving Its Negligence.

"The presumption [set forth in *The Oregon*] suffices to make a prima facie case of negligence against the moving vessel." *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d at 798 ("The striking of a fixed object on the dock by a moving steamer constitutes damage not ordinarily done by a boat under control and carefully managed, and is prima facie evidence of negligence." *Citing Ford Motor Co. v. Bradley Transportation Co.,* 174 F.2d 192, 196 (6th Cir. 1949)); see also *Brown and Root Marine Oper. v. Zapata Off-Shore*, 377 F.2d 724, 726 (5th Cir. 1967).

Application of the Oregon Rule shifts to the defendant the burden of disproving the presumption of negligence against it. *The Oregon*, 158 U.S. 186, 192-193 (1895), *citing The Clarita and The Clara*, 23 Wall. 1,13; (additional citations omitted) (where an anchored vessel was run into and sunk by a moving steamship, the presumption of fault was raised on the part of the moving vessel, "and the burden of proof is on her to exonerate herself from liability."). "This presumption

---

[1] *The Louisiana*, 70 U.S. (3 Wall.) 164, 174, 18 L.Ed. 85, 88 (1865) ("The collision being caused by the Louisiana drifting from her moorings, she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a *vis major*, which human skill and precaution and a proper display of nautical skill could not have prevented.").

4

operates to shift the burden of proof – both the burden of producing evidence and the burden of persuasion – onto the moving ship." *American Petrofina Pipeline v. M/V Shoko Maru*, 837 F.2d at 1326. "[W]here a collision occurs between a moving vessel and a moored vessel, a presumption of fault is raised against the offending vessel, which presumption must be rebutted by a preponderance of the evidence." *James v. River Parishes Co., Inc.*, 686 F.2d at 1132-33. The First Circuit is in accord. *City of Boston v. S.S. Texaco Texas,* 773 F.2d at 1398 (". . . a vessel colliding with a navigational structure has the burden of proving that the collision was an inevitable accident or *vis major*, which human skill and precaution and a proper exercise of nautical skill could not have prevented . . .." *Citing James v. River Parishes Co., Inc.,* 686 F.2d at 1132-33).

To rebut the presumption of fault that attaches under the Oregon Rule, the vessel "must show that it was without fault or that the collision was occasioned by the fault of the stationary object or was the result of inevitable accident." *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d at 795. The defense of inevitable accident carries with it a heavy burden.[2] Moreover, the defendant may not rely on the Coast Guard's Order to Alter, issued under the Truman Hobbs Act, 33 U.S.C. 511-523, (the "Order to Alter"), to shift blame for the Allision to the Bridge.

---

[2] "If the drifting or moving vessel offers as a defense that the collision was an unavoidable accident or vis major, '[t]he burden of proving inevitable accident or Act of God rests heavily upon the vessel asserting such defense.'" *James v. River Parishes Co., Inc.*, 686 F.2d at 1132, *citing Petition of United States*, 425 F.2d at 995. "Such vessels [asserting the defense of inevitable accident] 'must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required.'" *Brown & Root Marine Oper. v. Zapata Off-Shore*, 377 F.2d at 726, *citing Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 88 (5th Cir. 1960), *quoting L. Hand, J., in The Hylas*, 1925 A.M.C. 921, 925.

    III.    The Pennsylvania Rule is not Applicable Against the City.

        A.    The Pennsylvania Rule.

In *The Pennsylvania*, the Supreme Court stated:

> "The liability for damages is upon the ship or ships whose fault caused the injury. But when . . . a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." *The Pennsylvania*, 86 U.S. 125, 136, 19 Wall. 125, 22 L.Ed. 148 (1873).

With respect to the application of the rule set forth in *The Pennsylvania*, the First Circuit has indicated that "[I]f a [party] can establish both that the [opposing party] breached a statutory duty and that breach is relevant to the casualty in question, the [opposing party] assumes the burden of proving that its breach could not have caused plaintiff's damages." *Poulis-Minott v. Smith*, 388 F.3d 354, 363 (1st Cir. 2004). Other appellate courts describe a more particularized inquiry: "For the Pennsylvania rule to apply, three elements must exist: (1) proof by a preponderance of the evidence of violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent." *Union Pacific v. Kirby Inland Marine*, 296 F.3d 671, 674 (8th Cir. 2002).

        B.    The Pennsylvania Rule Should be Applied Narrowly.

Decisions by the First Circuit reflect that the Pennsylvania Rule is applied narrowly in this Circuit. The court recently stated that ". . . courts have noted that the Pennsylvania Rule is a 'drastic and unusual presumption'." *Poulis-Minott v. Smith*, 388 F.3d 354, 364-65 (1st Cir. 2004), *citing Capt'n Mark v. Sea Fever Corp.*,

6

692 F.2d 163, 167 (1st Cir. 1982) (quoting G. Gilmore & C. Black, *The Law of Admiralty* 494 (2d ed. 1975)).

In *Capt'n Mark, supra*, the First Circuit considered a claim by the F/V SEA FEVER, which was damaged in a collision with the F/V JOHN DAVID, that the JOHN DAVID bore the burden imposed under the Pennsylvania Rule for failing to sound its horn prior to the collision. Rule 34(d) of the International Regulations for Preventing Collisions at Sea, 33 U.S.C. foll., Section 1602, requires five short blasts of the whistle when "vessels in sight of one another are approaching each other" and one "is in doubt whether sufficient action is being taken by the other to avoid the collision. Rule 34(d)." *Capt'n Mark v. Sea Fever Corp.,* 692 F.2d at 167. The court found that the SEA FEVER was not lit, and thus not "in sight" of the JOHN DAVID, even though that vessel's radar showed another vessel in the area prior to the collision. The court did not apply the Pennsylvania Rule to the F/V JOHN DAVID, noting: "[t]he consequences of a finding of statutory fault, even now that the divided damages rule has been abandoned, are very serious. [citation omitted] A leading treatise labels the Pennsylvania rule 'a drastic and unusual presumption.' G. Gilmore & C. Black, *The Law of Admiralty* 494 (2d ed. 1975). We are therefore not inclined to stretch the plain language of the statute to cover a situation outside its terms." *Capt'n Mark v. Sea Fever Corp.,* 692 F.2d at 167.

The First Circuit has looked to the authority of the Second Circuit to narrow the application of the Pennsylvania Rule and avoid "extend[ing] the Rule's application in ways that would unmoor it from its animating principles.'" *Poulis-Minott*, 388 F. 3d 366, *citing Wills v. Amerada Hess Corp.*, 79 F.3d 32, 42-43 (2nd Cir.

2004) (quoting *Dir. Gen. Of India Supply Mission v. S.S. Maru*, 459 F.2d 1370, 1375 (2nd Cir. 1972).

In *Dir. Gen. Of India Supply Mission v. S.S. Maru,* the Second Circuit explained that application of the Pennsylvania Rule is "limited to the violation of a statute intended to prevent the catastrophe which actually transpired." The statute at issue in that case limited the loading of vessels, which was intended to prevent overloading and make the laden vessels less vulnerable in heavy seas. The owner of cargo damaged when an overloaded vessel ran aground argued that the violation required the application of the Pennsylvania Rule to the vessel owner. The Second Circuit disagreed: "Obviously the lower the ship is in the water, the more likely it will run aground in shallow waters, however, stranding in these circumstances would be primarily due to negligent navigation." *Id.* at 1376. The causative nexus between the violation and the harm was not sufficient to invoke the rule. By contrast, the rule would apply where overloading "caused the starboard rail to be rapidly and permanently submerged [causing the death of crewmen and the loss of cargo]." The court concluded: "To accept the theory that every violation of every safety statute would call into play the Pennsylvania rule irrespective of the purpose of the statute and the danger which it was intended to prevent, would in effect emasculate the burden of proof scheme of COGSA." Id.

In *Wilkins v. Am. Exp. Isbrandtsen Lines, Inc*., 446 F.2d 480 (2nd Cir. 1971), the Second Circuit refused to apply the Pennsylvania Rule to circumstances where "proof that the legal obligation was breached does not lead 'naturally and logically' to the conclusion that the breach caused the injury." *Id*., at 485, cited by *Poulis-Minott,* 388 F.3d at 364*, quoting Wills,* 379 F.2d at 43-44. In the *Wilkins* case, the Court refused to apply the Pennsylvania Rule in circumstances where a seaman

8

suffered a fatal heart attack after being required to work strenuous amounts of overtime, in violation of a safety statute that limited seaman overtime. The Second Circuit recognized that the seaman's overtime work "was not so devoid of probative value as to forbid an inference that it caused his heart attack," but the court nevertheless found that "the nexus between the violation of the statute and the seaman's heart attack was not so self-evident as to warrant the presumption that violation of the overtime statute resulted in the seaman's death." *Id.*

The Fifth Circuit has also limited the application of the Pennsylvania Rule. "As we have explained, the Supreme Court in *The Pennsylvania* 'did not intend to establish a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable or remote.'" *American River Transport Co. v. Kavo Kaliatra SS*, 148 F.3d 446, 450 (5th Cir. 1998), *citing Compania de Madaras de Caibarien, S.A. v. Queenston Heights*, 220 F.2d 120, 122-123 (5th Cir. 1955). ". . . [I]n admiralty," the court continued, "fault which produces liability must be a contributory and proximate cause of the collision, not merely a fault in the abstract." *American River Transport Co.*, 148 F.3d at 450, *citing Inter-Cities Navig. Corp. v. United States*, 608 F.2d 1079, 1081 (5th Cir. 1979).

The First Circuit has also expressed a disinclination to apply the Pennsylvania Rule to a stationary object "in circumstances where a vessel allides with a stationary object, even one that may be in violation of a statutory rule, that is "outside of [the vessel's] proper area of navigation [and] . . . properly marked on the charts and known to the master and pilot." *Pan American Grain Mfg. v. Puerto Rico*

*P.A.,* 295 F.3d 108, 115-16 (1st Cir. 2002). In *Pan American Grain Mfg.*, which is also cited in *Poulis-Minott*, the First Circuit addressed a claim by a vessel, which had struck submerged pilings that the vessel alleged were unauthorized obstructions in navigable waters under 33 U.S.C. 403, that the Pennsylvania Rule be applied to the defendant/wharfinger for said violation. The court determined that an actual statutory violation had not been proved. The court rejected the application of the Rule to the alleged violation, even if it had been proved, however, because the violation was not sufficiently related to the casualty in question:

> "The district court found that the casualty in question was a direct result of the fact that the [vessel] struck obstructions outside its proper area of navigation. Additionally, the obstructions which the [vessel] struck were properly marked on the charts and known to the master and pilot. Thus, [the vessel] has only its own imprudence to blame for the predictable result, and the district court properly refused to apply the Pennsylvania rule." *Pan American Grain Mfg.*, 295 F.3d at 116.

The question of whether the Truman-Hobbs Act constitutes the type of navigational or safety statute that could support application of the Pennsylvania Rule to a bridge owner is one of first impression in the First Circuit. Only two reported appellate decisions have specifically addressed the issue. Most recently, the Eighth Circuit found, based upon a thorough and well-reasoned analysis, that the Truman-Hobbs Act could not support application of the Pennsylvania Rule against a bridge owner because it is primarily a funding statute and not a safety statute. *Union Pacific v. Kirby Inland Marine*, 296 F.3d 671, 674 (8th Cir. 2002). In the other reported appellate decision specifically addressing the issue, *I & M Rail Link, LLC v. Northstar Navigation, Inc.,* 198 F.3d 1012 (7th Cir. 2000), the Seventh Circuit determined that the findings set forth in the Coast Guard's report supporting its Order to Alter were sufficient to overcome the presumption of negligence applied

10

to the vessel under the Oregon Rule, and left the parties to prove negligence without resort to presumptions.[3]

The Eighth Circuit provides the more detailed and well-reasoned analysis of the issue in *Union Pacific*. For the reasons set forth below, the First Circuit would similarly reject the application of the Pennsylvania Rule to a bridge struck by a moving vessel where the Coast Guard had previously issued an Order to Alter the Bridge under the Truman-Hobbs Act and apply the Oregon Rule to the vessel.

> C. The Truman Hobbs Act Is Not A "Statutory Rule Intended To Prevent [A]llisions."
>
> > 1. The Purpose Of The Truman-Hobbs Act Is To Regulate Funding For Bridge Improvements, Not Bridge Safety.

Section 512 of the Truman-Hobbs Act, enacted on June 21, 1940, (the "Act") states that "[n]o bridge shall at any time unreasonably obstruct the free navigation of any navigable waters of the United States." The analysis of whether a particular bridge is "an unreasonable obstruction to navigation" under the Truman-Hobbs Act, codified at 33 U.S.C. Sections 511-522, is fundamentally economic in nature. It entails a weighing by the Coast Guard of the potential benefits offered by an altered or reconstructed bridge against the cost to the federal government of paying its portion of the cost of that alteration or reconstruction.

---

[3] The *I & M Rail Link, LLC* decision is not directly relevant to the question of law presented by this motion. The Seventh Circuit does not shift the burden imposed by the Pennsylvania Rule to the bridge owner in that decision. Instead, the court determines, based upon the details of the Coast Guard's report supporting its Order to Alter, which were admitted into evidence, that the presumption of fault initially placed on the vessel under the Oregon Rule had been rebutted. While the City does not believe that Reinauer could make such a showing in this case, that issue is not before the court. The City seeks by this motion only an order that the Pennsylvania Rule is not applied against the City merely because the Coast Guard issued an Order to Alter prior to the Allision, leaving the presumption of the Oregon Rule in place against defendant.

11

Section 513 of the Act establishes the mechanism for gathering information concerning such benefits and costs. That section provides, in relevant part:

> "[w]henever any bridge shall, in the opinion of the Secretary [of Transportation], at any time unreasonably obstruct navigation, it shall be the duty of the Secretary, after notice to interested parties, to hold a hearing at which [all interested parties] shall have full opportunity to offer evidence and be heard as to whether any alteration of such bridge is needed, and if so what alterations are needed, having due regard to the necessity of free and unobstructed water navigation and to the necessities of the rail or highway traffic."[4]

The purpose of the public hearing mandated by Section 513 is to enable the Coast Guard to gather information concerning costs of navigation each year under the current bridge structure in relation to the potential decreases in costs (or increases in navigation capacity) that may accrue to the interests that utilize navigation in the area of the bridge as a result of proposed alterations balanced against the costs to the federal government of those proposed alterations. *See Union Pacific v. Kirby Inland Marine*, 296 F.3d at 674 ("Congress drafted the Truman-Hobbs Act 'to provide an orderly method for the just apportionment of the cost of the reconstruction or alteration of bridges over navigable waters where navigation conditions require such reconstruction or alteration of bridges heretofor built in accordance with law . . . .'" citing House Report No. 1447, August 2, 1939, 76th Cong. 1st Sess.)

The determination of whether a particular bridge must be altered under the Act is made within the context of a Benefit/Cost Analysis, including a calculation by the Coast Guard of the Benefit/Cost Ratio suggested by the information presented at public hearing. 33 C.F.R. 116.30. "The Benefit/Cost Ratio is calculated by dividing the annualized navigation benefit of the proposed bridge alteration by the

---

[4] The Secretary's duties have been delegated to the Commandant of the United States Coast Guard. See 33 C.F.R. 114.01.

annualized government share of the cost of the alteration." Id.  In circumstances such as the instant case, where the bridge in issue is not statutorily determined to be an unreasonable obstruction, ". . . an Order to Alter will not be issued unless the ratio [of benefit to cost] is at least 1:1." Id.  If the costs of the proposed improvements exceed the likely benefit, the bridge may not be declared an unreasonable obstruction.  This mandate supports the conclusion that the primary focus of the Act is upon the cost-effectiveness of the improvements, not the objective safety of the bridge.[5]

After an order to alter is issued, the bridge owner must submit plans for the alteration [33 U.S.C. 514] and, upon approval of the plans by the Coast Guard, solicit bids for the alteration work, which must also be approved by the Coast Guard. 33 C.F.R. 116.45.  The cost for the improvements are apportioned between the bridge owner and the federal government, with the bridge owner paying, generally, for that portion of the alteration that benefits road or rail traffic over the bridge, while the government covers all other costs, including those attributable to improved navigation.  33 C.F.R. 116.50.  "Although the bridge alterations may reduce the amount of allisions, this is a collateral consequence and not a direct purpose of the Truman-Hobbs Act." *Union Pacific*, 296 F.3d at 674.

In order to be eligible for the federal funding for improvements provided by the Truman-Hobbs Act, the Chelsea Street Bridge had to qualify, and did so qualify, as a "lawful bridge over navigable waters of the United States, including approaches, fenders, and appurtenances thereto . . .." 33 U.S.C. Section 511.  "We will not invoke

---

[5] *See Union Pacific v. Kirby Inland Marine*, 296 F.3d at 674: "We conclude that the Truman-Hobbs Act does not satisfy the first element of the Pennsylvania Rule because it was not drafted to protect marine safety, but to establish a procedure to provide government funds to assist bridge owners in altering their bridges."

13

the Pennsylvania rule to punish a bridge owner who controls a lawful bridge." *Union Pacific,* 296 F.3d at 676. The Order to Alter issued by the Coast Guard under the Truman-Hobbs Act does not impose specific time limitations for the alteration.[6]

        2.    <u>The Coast Guard's Finding Under 33 U.S.C. Section 512 Does Not Establish an "Actual Violation" of a Statute Sufficient to Trigger the Pennsylvania Rule</u>.

The Coast Guard's finding that the Chelsea Street Bridge constitutes an unreasonable obstruction to navigation was made under the Truman-Hobbs Act. Within the context of the Act, however, such a finding is made primarily on the basis of economic considerations determined sufficient to permit the Commandant to order improvements and apportion cost under the Act. "Looking at the Truman-Hobbs Act as a whole, a section 512 finding . . . is not a direct comment on the safety of the bridge. Instead, the Coast Guard labels a bridge an unreasonable obstruction in order to facilitate the funding process." *Union Pacific*, 296 F.3d at 675.

Section 512 is not a substantive rule of navigational safety that a party might actually, or actively, violate under the Court's rational in *The Pennsylvania.* As the Eighth Circuit noted:

> The Truman-Hobbs Act also does not satisfy the other two prerequisites of the Pennsylvania rule as it does not impose a specific duty or prevent a specific sort of injury. Once the Coast Guard concludes that a bridge violates Section 512, the bridge owner is required only to prepare a plan for altering the bridge. This 'duty' is very different from a duty to

---

[6] Unreasonable obstructions to navigation are also addressed in 33 U.S.C. Sections 494 and 502. These provisions are irrelevant here. The Order to Alter in issue was issued pursuant to the Truman-Hobbs Act, which specifically provides that "[t]he first sentence of section 494 of this title, and section 502 of this title, shall be inapplicable with respect to any bridge to which the provisions of this subchapter are applicable . . . ." 33 U.S.C. Section 522. The legislature's decision to exclude these other provisions relating to unreasonable obstructions to navigation from matters covered by the Truman-Hobbs Act provides further support for the City's position that the Act is primarily intended to regulate and apportion costs for improvements to navigation.

maintain lights and signals on a bridge or promptly open a draw. See U.S.C. 494. *Union Pacific*, 296 F.3d at 675.

For example, the Fifth Circuit applied the Pennsylvania Rule to a bridge owner in *Fla. East Coast RY. Co. v. Revilo Corp.*, 637 F. 2d 1060 (5th Cir. 1981), where the court determined in that case that the bridge owners had violated their statutory duty to open the bridge when signaled to do so by an approaching vessel or, alternatively, failed to signal that that the bridge would not open when signaled, and failed to provide the bridge with "competent and attentive tenders to operate the bridge." *Id.,* citing 33 C.F.R. 117.240. Distinguishing the nature of a section 512 violation from a section 494 violation, the Eighth Circuit stated:

> With respect to [the duty to maintain lights and signals and promptly open the draw], the application of the Pennsylvania rule is justified because a bridge owner greatly increases the risk of allision by [violating the statute]. Conversely, a bridge owner's failure to prepare a plan for altering a bridge will delay the funding process, but will not directly increase the risk of allision. [7] *Union Pacific*, 296 F.3d at 675.

The "non-compliance" by the City with section 512 of the Truman-Hobbs Act has had no direct effect on navigation through the draw by vessels on a day-to-day basis. Moreover, the Order to Alter was based upon information concerning navigational and economic conditions that had existed for years, and the City and Coast Guard have continued to cooperate in the intervening years on the proposed reconstruction and improvement of the Bridge contemplated in the Order. Utilizing the initial finding under section 512 to justify application of the Pennsylvania Rule to every allision since the issuance of the Order would improperly "stretch the plain

---

[7] Pursuant to 33 U.S.C. 519, the bridge owner who willfully fails to cooperate with the Coast Guard may be subject to monthly fines and the government may refuse to contribute to the improvements.

language of the statute to cover a situation outside its terms." *See Capt'n Mark v. Sea Fever Corp.,* 692 F.2d 163, 167 (1st Cir. 1982).[8]

### D. Safety Zone Regulations Promulgated By The Coast Guard Prevent Defendant From Invoking The Pennsylvania Rule.

Standing in stark contrast to the relatively benign implications of section 512 of the Act, upon which the Order to Alter is premised, are the prior actions of the Coast Guard regulating navigation through the draw of the Bridge on the basis of safety considerations. In 1986 the Coast Guard promulgated 33 C.F.R. 165.120, which created a safety zone in the waters extending 100 yards upstream and downstream of the Chelsea Street draw span. Several minimum requirements were established for vessels transiting through the draw of the Bridge, and the safety zone regulation allowed that "[a]dditional precautions may be taken by the pilot and/or person in charge (Master or Operator)." For example, the regulation requires that "[a]ll tankships greater than 1,000 gross tons shall be under the direction and control of a Licensed Federal Pilot . . . [and] all vessel(s) speed shall be kept to a minimum considering all factors and the need for optimum vessel control."[9] The regulations regarding the Coast Guard's establishment of the safety zone around the Bridge were operative at the time of the Allision.

To the extent that the defendant's vessels were not in violation of the safety zone requirements of 33 C.F.R. 165.120 at the time of the Allision, it is reasonable to

---

[8] Recognizing the incongruence between Section 512 and the safety and navigational statutes contemplated by the Pennsylvania Rule, the Eighth Circuit opined: "We will not employ the Pennsylvania rule to punish a bridge owner who maintains a lawful bridge, even though the Coast Guard has found such a bridge to be an unreasonable obstruction due to the barge industry's expansion of the size of its commercial vessels." *Union Pacific*, 296 F.3d at 676.

[9] The regulation also contain specific restrictions on the size and draft of vessels that could transit the draw, such as "[n]o vessel greater than 630.5 feet in length or 85.5 feet or greater in beam shall transit the Safety Zone during the period between sunset and sunrise."

16

presume that the vessels, consistent with that regulation, could be expected to transit the draw safely. To the extent that the defendant's vessels <u>were</u> in violation of the safety zone requirements of 33 C.F.R. 165.120 at the time of the Allision, the Pennsylvania Rule must be applied to the defendant, not the City. The particular requirements of navigation through the draw of the Bridge had been in place for several years at the time of the Allision, and were known or should have been known to the defendant at that time. In light of the prior navigational regulations imposed by the Coast Guard on vessels transiting the draw of the Bridge, the Coast Guard's Order to Alter cannot rationally be used to shift the burden to the Bridge to prove that, simply by being there, it could not have caused any (and every) particular allision occurring after the issuance of the Order and prior to the completion of the alterations.

CONCLUSION

For the reasons set forth herein, the City hereby requests that this court issue an order that the City has established a prima facie case of negligence against the defendant by application of the Oregon Rule, which the defendant must rebut by a preponderance of the evidence, and, further, that the defendant may not rely on the issuance of the Order to Alter, by application of the Pennsylvania Rule, to rebut said presumption of negligence.

By its attorneys,

/s/John J. Finn
John J. Finn, BBO# 166060
Michael A. Finn, BBO# 647793
FINN & FINN
34 Chamberlain Street
P.O. Box 154
Hopkinton, MA 01748
(508) 497-5019

Dated: October 31, 2006