# EXHIBIT

# A

# CHELSEA STREET BRIDGE

## CHELSEA RIVER (CREEK)

### Boston, Massachusetts

# FINAL CASE REPORT
# Truman-Hobbs Action

Prepared by
Commander (obr)
First Coast Guard District
408 Atlantic Avenue
Boston, Massachusetts 02210-2209

# TABLE OF CONTENTS

|  | | PAGE |
|---|---|---|
| I. | EXECUTIVE SUMMARY | 1 |
| II. | PURPOSE AND EXTENT OF STUDY | 2 |
| III. | SUMMARY OF COMPLAINTS | 2 |
| IV. | HISTORICAL BACKGROUND | 4 |
| V. | DESCRIPTION OF EXISTING BRIDGE AND DATA ON BRIDGE OPENINGS | 5 |
| VI. | DESCRIPTION OF THE WATERWAY AND NAVIGATION | 7 |
| VII. | DATA ON ACCIDENTS | 8 |
| VIII. | DATA ON COMMERCE | 9 |
| IX. | NAVIGATION IMPACT STUDY | 10 |
|  | A. Water Accident Reduction Savings (WARS) | 10 |
|  | B. Transportation Time Savings (TTS) | 11 |
|  | C. Benefits of Economy of Scale (BES) | 13 |
|  | D. Certain Other Savings (COS) | 14 |
|  | E. Other Benefits | 19 |
| X. | NAVIGATION BENEFIT COMPUTATIONS | 20 |
| XI. | DISTRICT FINDINGS | 21 |
| XII. | DISTRICT RECOMMENDATIONS | 25 |

ENCLOSURES:

1 Photos of Bridge (See Page 11 of PCR)

2 Charts of Area (See Page 18 of PCR)

3  Engineering Studies - (G-NBR ADD)

4 Cost Estimate (G-NBR ADD)

5 Environmental of Consideration (See Appendix I of PCR)

6 Letters of Complaint (See Appendix A of PCR)

7 Calculation of Benefits (Formulas)

8 Public Hearing Transcript

9 Preliminary Case Report

## I.   EXECUTIVE SUMMARY

The Chelsea St. Bridge (CSB) is a bascule bridge which spans Chelsea River (Creek) carrying vehicular traffic between the Town of Chelsea and East Boston.   The Chelsea River is the major distribution point for gasoline and heating oil in the Boston area.   The present bridge was authorized in 1935, completed in 1937, and its fender system was altered in 1960.   The draw provides an opening of 96 feet which is not adequate for the safe passage of tankers.   The CSB has a history of hazarding and unreasonably obstructing commercial navigation on the waterway. The Coast Guard has documented 98 bridge allisions since 1972. Since 1975, the bridge has been out of service to vehicular traffic for approximately 1480 days due to damage caused from vessel allisions.   The bridge allisions have been disruptive and costly to both commercial users of the waterway and the automobiles and trucks who depend on the bridge and roadway.

The original bridge design did not anticipate the need to accommodate large 600 to 800 feet length tankers with beams of up to 157', stringent environmental laws, and requirements for double hull/double bottom tankers as mandated by the Oil Pollution Act of 1990.

Navigational benefits total over $100 million on an annualized basis compared to an estimated annualized cost of $3.5 to $4.5 million for a vertical lift bridge providing a 380' horizontal opening.   Therefore, an annualized benefit/cost ratio of over 20 to 1 is anticipated.   This estimate includes benefits identified by the Massachusetts Division of Energy Resources report (Appendix H of the PCR) in the prevention of a catastrophic accident which would close the waterway and increase petroleum costs throughout the Boston region.

-1-

## II.  PURPOSE AND EXTENT OF STUDY

This report constitutes the final phase of the Chelsea Street Bridge (CSB) Truman-Hobbs Action.  The purpose of this investigation is to present information which substantiates the assertion that the CSB is an unreasonable obstruction to navigation and to determine the type of alterations required to meet the needs of present and future navigation.

Navigational benefits considered include: 1) savings realized from a reduction in the costs associated with bridge allisions (WARS); 2) savings realized from a reduction in vessel transit times through the zone of the bridge (TTS); 3) savings due to increased vessel carrying capacities (BES); 4) and those related to certain other costs (COS) attributable to the obstructive character of the bridge.

A detailed description of the purpose and extent of the study was discussed in section II of the PCR.

## III.  SUMMARY OF COMPLAINTS AND PUBLIC HEARING COMMENTS

The complaints regarding the Chelsea Street Bridge (CSB) have taken many forms from letters, to meetings, to news articles.  The concerns raised and solutions implemented have been attempts at quick fixes to address the immediate or most apparent concern without getting to the root of the problem - that the bridge was too narrow to adequately provide for the needs of navigation.

On 19 August 1992 a public hearing, as announced in the Federal Register of 1 July 1992 and in Public Notice 1-785, was held in Boston City Hall at 7:00 PM in order to gather information and comments regarding the proposed alteration of the Chelsea Street Bridge (CSB) under the Truman-Hobbs Act of 1940.

Thirteen (13) of the 38 individuals attending the proceeding made verbal presentations and 12 written exhibits were submitted. The Coast Guard received 11 written comments during the public

hearing comment period.    (3 documents submitted as exhibits at
the public hearing were identical to those sent to the Coast
Guard during the Public Notice comment period.)    Of the 20
written comments received, 6 came from political officials, 5
from public agencies, and 9 were submitted by various petroleum
industry organizations.

Enclosure (7) of the final report contains a verbatim
transcript of the public hearing, copies of the exhibits (A-N),
and copies of letters received by the Coast Guard during the
comment period, enclosures (O-Y).

The following is a summary of the main points raised at the
public hearing and in the letters received during the comment
period.  No comments in opposition to replacement of the CSB were
received.  All comments supported the contention that the CSB is
obstructive to navigation.  Many respondents commented on the
negative local and regional economic impacts caused by the CSB.

Stephen J. Remen of the MA Division of Energy Resources
(MDOER) explained that the restraints imposed by the CSB increase
the inbound cost of transporting petroleum products by at least ½
to 1 cents per gallon producing an additional annual cost of $9
to $18 million to retail consumers. (see enclosure Ga/Gb)

_____ of the Massachusetts Petroleum Council cited that
"the bridge continues to exact an annual toll of at least $15 to
$35 million dollars a year in increased shipping costs for
petroleum transported up the Chelsea Creek."  Mr. _____ further
noted that a more accurate estimation of the impact of the bridge
on transportation costs, must reflect an increase in cost of
petroleum for all the petroleum terminals in Boston Harbor.  Thus
the bridge's affect "has in all likelihood been as high as $40 to
$50 million dollars a year." (see enclosure H of Public Hearing
Record (Encl 8))

Several respondents commented on the high economic costs of
compliance with the Oil Pollution Act of 1990 if the CSB is not
replaced.  Mr. _____ of the Kirby Corporation, stated that "the
limitations imposed by the bridge directly inhibit the construc-

-3-

tion of US flag tank ships which comply with the requirements of the OPA 1990 and its implementing regulations." Mr. _____ also states that "the narrow span presents an unreasonable risk of striking the bridge and ... of a resulting pollution incident." (see enclosure U of Public Hearing Record (Encl 8))

Many persons expressed their concern that the narrow opening of the CSB may precipitate a catastrophic allision which could have devastating environmental and economic consequences. Industry representatives estimate that the retail price of petroleum products would increase 1½ to 10 cents per gallon. MDOER estimates that a 6 month waterway closure would increase consumer spending on petroleum products from $13.7 million to $235 million dollars. Such an incident would produce a significant loss in disposable income and result in a net loss of 1,944 jobs in the Boston area.

MASSPORT, the Cities of Boston and Chelsea, and the Massachusetts Petroleum Council cited the need for construction activities to minimize roadway and waterway closures due to the importance of the present bridge in providing access between the cities of Boston and Chelsea, to Logan Airport, and the oil terminals upstream of the bridge. The Army Corps stated that Coast Guard replacement of the CSB may influence their present plans to dredge Chelsea River to 38 feet in favor of deepening the waterway to 40 feet.

A summary of the concerns and complaints is presented in Section III of the Preliminary Case Report (PCR). Appendix A of the PCR provides copies of the letters of complaint submitted to the Coast Guard.


## IV.  HISTORICAL BACKGROUND

The first bridge to appear on Chelsea River (Creek) was the Chelsea St. Bridge (CSB) in 1834. This swing bridge provided a 36' navigational opening and was rebuilt in 1868 with the same

-4-

dimensions and alignment. The great Chelsea fire of 12 April 1908 destroyed the bridge. Later that year a swing bridge was built with a 60' navigational opening. The alignment was chosen for compatibility with the Boston & Albany Railroad's Grand Junction Bridge located 100 feet upstream.

The present CSB was completed, in 1936, at an estimated cost of $400,000. However, upon completion, the bridge provided only a 70' wide navigational channel for marine traffic. This 70' clearance limitation remained until 1960 when the Boston & Albany Railroad Company was ordered by the Secretary of the Army to remove, from the waterway, certain parts of the Grand Junction Railroad Bridge which were no longer used for rail traffic. The intent was to increase the horizontal clearance for marine traffic to approximately 100'. In conjunction with said removal the ACOE recommended that the fender system of the CSB be altered to afford a horizontal clearance, of 96' between fenders, normal to the axis to the channel. The restoration of the fender was funded under the Truman-Hobbs Act in conjunction with removal of parts of the Grand Junction Railroad Bridge which was accomplished between November 1960 and June 1961. Portions of the railroad bridge still remain near both banks of Chelsea River.

Section VI and Appendix B of the PCR contain the CSB detailed historical background, chronology and appropriate CSB permits, amendments, and orders to alter.

## V. DESCRIPTION OF EXISTING BRIDGE AND DATA ON BRIDGE OPENINGS

The Chelsea St. Bridge (CSB) is one of three vehicular bridges crossing the navigable portion of Chelsea River (Creek). The bridge carries vehicular traffic over Chelsea River between Chelsea and East Boston. The bridge was designed to carry trolley cars as well as automobiles and trucks.

The superstructure is comprised of five approach and one bascule span. Beginning at the East Boston abutment, the span lengths are 66'0", 42'6", 140'0", 66'0", 66'0", and 66'0", respectively. From abutment to abutment the total length of the bridge is 446.5'. The bascule span is a 140' single leaf Strauss-Heel-Trunnion bascule bridge with an overhead swinging counterweight. In the full open position (82.5 degrees), the tip of the bascule span overhangs the East Boston fender by approximately 15'. The vertical clearance to low steel at the fender is 112.75' above MHW in the full open position. In the closed position, the bridge provides a vertical clearance of 19' at mean low water and 9' at mean high water.

The bridge opens for all marine traffic except small powerboats. A compilation of the bridge openings from 1978 through 1989 is provided in Appendix C of the PCR which shows that in 1989 the bridge opened an average of 234 times per month. The Massachusetts Petroleum Council in Enclosure H to the Public hearing record stated "As a result of diminishing supply of "Chelsea Class" ships, we have seen an increasing amount of traffic due to lightering of larger vessel... If Chelsea Creek Bridge is not replaced we must expect an exponential growth in barge traffic in years ahead. Captain Abrams, MSO Boston stated that for the period 1 October 90 to 1 October 1991 there were 1,551 tankship and tank barge transits of Chelsea Creek. This was up 120 transits from the previous 12 month period.

The bridge is in generally fair condition. The East Boston and Chelsea fenders are in a deteriorated state of repair and provide minimal protection to the bridge due to numerous vessel allisions. Due to Coast Guard civil penalty assessments and other actions, reconstruction and upgrade of the entire fender system at an estimated cost of $3.8 million, began in July of 1992.

A detailed description of the bridge and its structural condition is presented in Section V. of the PCR.

-6-

## VI.  DESCRIPTION OF WATERWAY AND NAVIGATION

Boston Harbor is New England's largest seaport. Chelsea River (Creek), one of seven waterways that comprise the Port of Boston, is the border between the Town of Chelsea on the west bank and the cities of East Boston and Revere to the east (see figure 2 of PCR). It is subject to tidal fluctuations of 9 to 11'.

The present Army Corps of Engineers (ACOE) authorized project depths for the Port of Boston varies from 35 to 40 feet at mean low water. The mouth of the Chelsea River is located at the confluence of the Main Ship Channel and the Mystic and Chelsea Rivers. From this area, known as the Inner Confluence, the Chelsea River proceeds for a navigable distance of approximately 2.6 miles. The marked Federal Channel is 35 feet deep and is generally 225 to 430 feet wide with a turning basin 800 feet wide and 1,000 feet long.

In a 10 September 1992 letter the Army Corps of Engineers indicated that replacement of the CSB would trigger a review of their present plans to deepen Chelsea River to 38 feet and may allow justification to deepen the channel to 40'. Chelsea River was last dredged to 35 feet in 1962. The Corps of Engineers project map (Figure 4 of PCR) and an excerpt of NOAA Chart 13272 (Figure 5 of PCR) show the location and alignment of the channel. From these documents, it is readily apparent that marine traffic must contend with various problems in delivering petroleum product to the facilities on Chelsea River. These include a relatively narrow, winding river with bridges like the CSB that restrict marine traffic.

Two moveable bridges cross the navigable portion of Chelsea River and are the only bridges that vessels must transit to service the upstream petroleum terminals. The P.J. McArdle Bridge (Meridian St. Bridge) at mile 0.3 is a double leaf bascule which provides a horizontal clearance of 175' and a vertical clearance of 21' above MHW in the closed position. The CSB, at

mile 1.2 is a single leaf draw bridge with a horizontal clearance of only 96' between fenders and a vertical clearance of 19' and 9' at MLW and MHW, respectively, in the closed position. The bascule span overhangs the East Boston fender by approximately 15'. This overhang is obstructive to vessels with mast, boom, crane and pilot houses heights greater than 112' 9". Most tankers transiting the bridge, especially after discharging all or a portion of the cargo must be listed 2 to 3 degrees away from the East Boston side to clear the bascule span. Because the span is so narrow, assist tugs must be released from alongside the tankers and be positioned on either side of the bridge to adjust the position and orientation of the tanker as it transits the CSB.

The waterway is almost exclusively used for the transport of petroleum products by oil tankers assisted by tugs and tug/barge combinations. The three year averages (1988,1989,1990) for bridge transits of tankers, tug & barge combinations, and motor tankers are: 151, 538, and 45, respectively.

The 'Chelsea Class' tankers in use today range from 25 Deadweight Tons (DWT) to 40 DWT. This tanker is limited by the bridge horizontal clearance and safety restrictions to beams of 90.5 feet while overall lengths are approximately 560'.

A detailed description of the waterway and navigation is provided in Section VI. of the PCR. A breakdown of marine traffic and bridge openings from 1978 to 1989, from CSB Bridge logs, is presented in Appendix C of the PCR.

## VII. DATA ON ACCIDENTS

Bridge Administration has documented 98 vessel allisions occurring between 1972 and 1991. Several of these accidents have resulted in bridge closures to vehicular traffic ranging from 2 weeks to 2½ years (See WARS 2 of PCR). One allision in December of 1991 resulted in a serious injury to a crew member of the Tug Guido during transit of the bridge. (See Appendix E of the PCR)

-8-

## VIII.   DATA ON COMMERCE

Commerce on Chelsea River is dominated by the 9 active oil distribution terminals located on its banks, 8 upstream of the bridge and 1 downstream.   As noted in Massachusetts Petroleum Council's statement in Enclosure H to the Public Hearing Chelsea Creek houses one of the largest concentrations of petroleum storage tanks in New England.   These facilities play a vital role in supplying gasoline to consumers within a 100 mile radius of Chelsea River and heating oil to consumers within a 50 mile radius.   According to Mr. Rosadini, Gulf Oil Vice-President of Operations, the restrictive nature of the Chelsea Street Bridge (CSB) is a regional problem effecting the supply and distribution of petroleum products to Gulf's customers in Vermont and New Hampshire as well as those in the immediate Boston area (see enclosure 8).

The primary commodities moving on Chelsea River are refined oil products consisting of kerosene, heating oil, gasoline, jet fuel, and residual fuels.   Chelsea River oil distribution terminals supply the Boston region with 55% of its home heating oil and gasoline, 68% of jet fuel for Logan and other airports, and 20% of its residual fuel.   A summary of cargo and vessel data for Chelsea River from ACOE Waterborne Commerce is presented in Table 2 and 3 of the PCR.   Table 2 shows that commercial navigation on Chelsea River between 1980 and 1989 carried an average of 8,649,592 short tons of maritime commerce.   In 1989, total short tons carried was 7,888,946.

Chelsea River fuel supplies are split evenly between U.S. and foreign sources.   Domestic sources from the Gulf states rely, primarily, on oil pipeline and barges from the New York City area for delivery to Chelsea River terminals while most foreign oil is transported by tanker.   U.S. Flag tankers do however, carry about 10% of the product tonnage arriving at the Chelsea terminals.   Of the foreign sources Venezuelan and Canadian refineries supply about 70% of the refined petroleum product purchased by the Chelsea River oil facilities.

-9-

For a detailed discussion of the importance of Chelsea River terminals to the Massachusetts economy see Appendix H of the PCR. Chelsea River commerce is also discussed in the BES section of the PCR beginning on page 54. Quantitative information can be referenced in the PCR-Tables 1,2,and 3, BES Table 1, and Appendix C (1989 ACOE Waterborne Commerce).

## IX. NAVIGATION IMPACT STUDY

To qualify as an unreasonable obstruction, under the Truman-Hobbs Act, a benefit/cost ratio of one or greater is required for improvements to meet the present and future needs of navigation. The navigation benefits are discussed individually in the following parts of this section.

A.  Water Accident Reduction Savings (WARS)

WARS is the projected annual monetary saving resulting from a reduction in allisions with the bridge. These annualized savings were developed by first examining the cost of repairs to the vessels, the bridge and its appurtenances (WARS 1). The second portion of this savings is developed by analyzing the cost to vehicle users of the bridge (CVUB) which were caused by the vessel allisions and disrupted by land in lieu of marine service (WARS 2 and 3).

A period of 20 years (1972 to 1991) was chosen as a statistically valid time period for the Chelsea Street Bridge (CSB). During this time period a total of 98 vessel allisions have been documented (See Appendix E of the PCR). Capt. Abrams, U.S. Coast Guard Marine Safety Office - Boston stated at the public hearing - "even taking into consideration the navigation restrictions we have imposed, obviously for the sake of safety, and to avoid allisions...we still had 36 allisions with the bridge, ... since the time of restrictions going into place... that comes out to one incident every 2.1 months. It's not an acceptable risk."

-10-

1. WARS 1 Vessel/Bridge Allision Damage Reduction

The cost of damages to the CSB, its fender system, and the vessels involved in bridge allisions total $10,940,612 in 1991 dollars for the 20 year period - 1972 to 1991. This gives an annualized cost savings of $492,328 (See WARS Table 1 of PCR (encl 9)).

2. WARS 2 and 3 Bridge Allision Cost to Vehicular Users.

Closure of the bridge to vehicular users imposed time delay costs (WARS 2) and additional operating costs (WARS 3) because vehicular traffic was forced to reroute normal transportation patterns.

The cost to vehicular user of the bridge (CVUB) are examined in two components that are then combined to give the total vehicular user cost. In examining each of these components truck and car operations are computed separately. The CVUB is presented in WARS Tables 2A, 2B, 3A and 3B of the PCR using principles and standards used by FHWA and the National Research Counsel. The same 20 year period as used for WARS 1 and used to calculate the annualized CVUB. However, no correction factor is assumed because replacement of the bridge intended to eliminate major accidents that would remove the bridge from service. Between 1972 and 1991 vehicular users were prevented from using the bridge for 1480 days. The total cost to vehicular users of the bridge during the time period studied (WARS 2 and 3) was a total of $55,953,524 with the annualized cost savings being $2.8 million. Encl (7) of this report contains formulas for calculation of WARS 1, 2 and 3. For a detailed description of WARS methodology see Section VIII of the PCR.

Total WARS annualized benefits are $3,290,004.

B.  Transit Time Savings

Transit Time Savings (TTS) quantifies the cost of time delays imposed on commercial navigation in the bridge zone. The difficulty and danger of moving a tanker, tug and barge (T&B), or motor tanker (MT) through the 96' draw of the Chelsea St. Bridge (CSB) which causes Captains, pilots and tug & barge operators to

-11-

use extra care and diligence. This action translates into increased transit time and higher operating costs for all vessels transiting the bridge zone. TTS is the measure of monetary savings that could be realized by alteration of the CSB and elimination of the present restriction.

There are two main factors in the determination of TTS. The first is the estimation of time delay in the zone of the bridge. The second is the operating costs of the vessels which transit the bridge. These factors are then multiplied to arrive at a TTS for each particular vessel type.

1. TTS 1 Product Vessel Transit Delay Savings

Delay time is the difference, in minutes, between the time required to safely transit the bridge zone with and without the navigational restriction. Delay time, for each vessel type, was determined by responses to survey questionnaires distributed to facility and marine managers of the oil terminals on the waterway, and information from pilots and towing companies. This data was supplemented by observing vessel transits through the bridge zone. The results show average delay in the bridge zone for MT of 15 minutes; T&B 20 minutes; and tankers at 25 minutes.

TTS Table 1 of the PCR presents the transit time savings (TTS) for MT, T&B, and tankers, averaged for the number of each type of vessel which transited during 1989 and 1990. The total average annual delay cost was then doubled to account for both inbound and outbound savings. T&B and assist tug operating costs were obtained through consultation with commercial users of the waterway. Operating cost for tankers was obtained from Corps of Engineers compiled data. TTS 1 = $245,426 annualized.

2. TTS-2 Tanker Assist Tug Transit Differential Savings

TTS Table 2 of the PCR presents additional transit time savings for tugs assisting large tankers transiting the CSB. Tug assistance to move vessels to points above the CSB is charged at a higher rate than assistance for vessels bound for berths downstream of the bridge. The CSB accounts for an increased cost of $243 per tug/transit. The number of transits and the average

number of tugs were determined for 1989 and 1990. The total average annual differential cost was then doubled to account for both inbound and outbound savings. TTS 2 = $277,822 annualized.

3. **TTS 3 Tug & Barge Assist Tug Transit Differential Savings**

TTS Table 3 of the PCR presents the transit time savings when T&B units are required to have assist tugs. The same cost differential of $243 per tug/transit applies as used for TTS 2. TTS 3 = $49,937 annualized.

Encl (7) of this report contains formulas for calculation of TTS 1, 2, and 3. For a detailed explanation of TTS methodology see Section VIII of the PCR (encl 9).

The total TTS annualized benefits are $573,185.

C. <u>Benefits of Economy of Scale (BES)</u>

Benefits derived from economies of scale refers to the use of larger capacity tanker vessels to reduce petroleum product transportation costs. As noted in ▨▨▨ of Massachusetts Petroleum Council's comments the CSB's "narrow span has given rise to increasingly expensive restrictions on the size of vessels that can carry their cargoes to the upper reaches of the Chelsea. ... This CSB's 'negative economic' factor is certainly not limited to Boston Harbor. Because many of the ships destined for the creek also off-load petroleum products at other New England ports, the Chelsea beam limitation effectively denies the New England ports the shipping cost reductions achievable through economies of scale from larger vessels." (Exhibit H to Public Hearing Transcript (encl 8)).

The high transportation cost for petroleum products received at the Chelsea River facilities are not born by the petroleum companies themselves. Rather, these costs are passed on to the consumers of Chelsea River fuels. Massachusetts Division of Energy Resources (Appendix H of the PCR or Encl. 8 of this report) estimates the cost of this transportation surcharge at between $9 and $18 million dollars (1991 dollars). ▨▨▨ of the Massachusetts Petroleum Council stated that "it is safe to assume that the bridge continues to exact an annual toll of at

-13-

least $15 to $35 million dollars a year in increased shipping costs for petroleum transported up Chelsea Creek. ... In fact, we believe this number is quite conservative. We believe the true cost for Chelsea Creek bridge must reflect an increase in cost of petroleum through out the entire harbor. ... the Bridge's 'toll charge' has in all likelihood been as high as $40 to $50 million dollars a year." (see Exhibit H of the Public Hearing Record (Encl. 8). Our independent estimate, on the lower end of the above calculations, attributes a BES cost savings of $11,129,296 annually in 1991 dollars. Encl 7 of this report contains formulas for (see Section VIII of the PCR for a detailed discussion of BES).

D. Certain Other Savings

The Chelsea St. Bridge (CSB) has an extensive history of hazarding and delaying navigation. In 1985, as a result of several costly bridge allisions, an array of pilot complaints, and general safety concerns, the Coast Guard Captain of the Port/ Marine Safety Office - Boston established a Safety Zone and stringent regulations (33 CFR 165.120) for all vessels transiting the bridge zone. These regulations pertain to vessels operating within a 100 yards upstream and downstream of the CSB. The regulations place limits on: the size of vessels transiting the zone; the movement of vessels if a vessel is docked at the Mobil Oil terminal (downstream of the bridge); the time of day a vessel may transit the bridge; the freeboard of outbound vessels (ballasting requirements); and the quantity of tugs which must accompany vessels moving through the bridge. Appendix F of the PCR contains a copy of Chelsea River safety regulations.

Cost savings relating to the elimination of the above restrictions, necessitated by the hazardous conditions created by the narrowness of the CSB navigational opening and by the overhang of the bascule girders, are addressed below as savings (COS 1 thru Cos 7). These savings are a measure of the additional operating costs imposed on petroleum carriers and the oil facilities due to the obstructive character of the CSB.

-14-

Vessel delay data were developed through questionnaires completed by petroleum facility managers. The completed questionnaires have not been provided because the information is of a propriety nature. A sample questionnaire is provided in Appendix F of the PCR.

## COS 1: Anchorage Delay Cost

COS 1 addresses delays imposed on inbound tankers waiting for favorable conditions, tide, or daylight to proceed upstream of the bridge. The tidal delay in this case is waiting for slack water or the start of the ebb tide to increase vessel control. Based on oil terminal data, the average inbound delay was 4 hours. An annualized delay cost savings for COS 1 is $397,499.

## COS 2: Mobil Terminal/ Draw Realignment Savings

The center of the Mobil Oil terminal dock is located on the East Boston side of the waterway about 675 feet downstream of the Chelsea St. Bridge (CSB). The East Boston fender line is approximately 90' off the face of the Mobile Oil Terminal dock. The narrowness of the CSB draw and its close proximity to the Mobil dock necessitated certain safety zone restrictions (33CFR 165.120), which contribute to delays experienced by marine traffic. A total of 66 separate incidents of delays due to vessel vessels at Mobile's Terminal in 1990. These delays averaged 8 hours. However incidents, as cited by Crest Tankers, show that delays of 25 hours or more have occurred with an unacceptable frequency. Based on 1990 data an annualized COS 2 of $384,912 was achieved.

## COS 3: Daylight, Tide, and Ballast Delays - Outbound

In addition to the delays previously discussed in COS 1 and COS 2 outbound vessels and some vessels shifting berths within the port must be ballasted to comply with safety zone requirements. Outbound delays were determined by estimating the length of time a vessel would require to offload its product without the restrictions caused by the present CSB. This was estimated to be 23 hours. Based on a review of the bridge logs it was determined that tankers, other than small coastal tanker

spent an average of 37 hours upstream of the CSB. Thus, an average delay of 14 hours was computed giving an annual cost of $1,545,362 for COS 3.

COS 4: Cost of Extra Tugs

The basis of COS 4 is that widening the CSB navigational draw span will eliminate the cost differential between facilities on Chelsea River and the quantity of assist tugs will decline. This cost was analyzed from two aspects - first from the need for extra tugs to assist tanker (COS 4A) and secondly, the cost of extra tugs to assist tug and barge units (COS 4B). The bridge logs show that tankers presently require, on average, 3.7 tugs per tanker passage. Occasionally, 5 tugs are required to make safe passage through the bridge. If the CSB were replaced only 2 or 3 assist tugs would be required to assist vessels with bridge transits and in docking. For the purpose of this analysis, extra tugs are defined as the quantity of tugs exceeding 3 tugs per transit. The annual cost for extra tugs assisting tankers is $268,304 (COS 4A) and for assisting tug and barge units is $269,616 (COS 4B)

5. COS 5/COS 6  Tanker Design/Construction Savings

If the CSB is not replaced than a specially designed group of Chelsea Class ships must be built to comply with Coast Guard regulations under the Oil Pollution Act of 1990 (OPA 90). These regulations require that the double hulls be at least 2 meters wide and the double bottoms be at least 2 meters deep. Due to the uniquely restrictive beam limitations of the CSB double-hull vessels for Chelsea River use will have to be customized at an extra cost of between 10% and 15% to design and build. As noted in Commissioner Remen, of MDOER, remarks - "at present, it is not certain whether new, double hulled tankers will be built small enough to fit through the CSB. If they are not, traffic will be restricted to barges, which are smaller than tanker, which will necessitate additional trips, further increasing costs. If more 'lightering' or unloading of oil product from tankers to barges occur just outside Boston Harbor, there will be increased chance

-16-

of oil spills and associated environmental damage.

[ ] ... _ of Northeast Petroleum stated in Exhibit I of encl 8 - " However with these vessels beginning to be replaced it is becoming increasingly harder to arrange transportation that meets these criteria. This is because vessels are typically designed to meet the maximum product lifting capacity and provide the most economical form of transportation. The replacement size vessel will not fit or be able to transit the CSB as it exists today,"

In order to begin replacing the single-hull vessels as they are phased out by the OPA 90 regulations 2 US flag and 10 foreign flag ships will have to be built per year (see BES Table 15 of Section VIII of the PCR (encl 9) for a detailed description of vessel replacement rates).

As with BES, it is necessary to consider U.S. Flag ships differently than foreign flag ships. The Jones Act mandates that only U.S. Flag vessels can pick up product at U.S. ports and deliver it to another U.S. port. There are 218 U.S. Flag tankers in the World Tanker fleet today but only 64 are "Boston Suitable". Chelsea River facility operators have stated that 50% of the time their requests for pick-up and delivery of U.S. Gulf Oil are not met because of a lack of availability of U.S. Flag tankers. Kirby Corporations letter dated 3 September 1992 (Exhibit U in encl 9) stated that Sabine Transportation Company, ( a subsidiary of Kirby) operates six U.S. flag tankships engaged in coastwise trade, primarily between ports along the Gulf of Mexico, Caribbean Basin and the U.S. East coast. ... The limitations imposed by the bridge directly inhibit the construction of U.S. flag tankships which comply with requirements of OPA-90."

The surcharges on design and construction for the replacement Chelsea class tanker fleet is $12,381,000, for US flag, and $24,762,000, for foreign flag vessels on an annualized basis.

-17-

6. COS 7  Savings From Prevention of Catastrophic Allision

The risk of a catastrophic bridge allision is not insignificant. Captain Abrams, U.S. Coast Guard Marine Safety Office, Port of Boston stated, "it's incredible that we have not had the side of a ship or the side of a barge split open when contacting either the fendering system ... or the bridge" (see Encl 8). The bridge and its fendering system sustained 98 documented allisions in the 20 year study period (1972-1991). Several of these incidents were serious enough to take the bridge out of service to roadway traffic for long periods of time.

Captain Doherty of Citgo Petroleum Corporation in Exhibit N of encl 8 stated that "the requirement for 'double-hull' tankers will significantly reduce the availability of 'Boston Bingo' class tankers as older tankers are removed from service by statute. This will...make the harbor dependent upon an aging class of tankers, rather tan allowing Boston t take advantage of the new, environmentally safer OPA-90, double hull vessels.

Based on past record of allisions, closure of Chelsea River to marine traffic resulting from a severe allision is not improbable. Industry sources estimate that if an accident at the bridge closed the waterway to ship traffic, they might have sufficient petroleum product supplies in inventory to meet only 3 to 10 days of demand (depending on their inventory level, time of year and type of product). Captain Abrams and others at the public hearing stated that the Chelsea Street Bridge posed an unacceptable risk.

MDOER estimates the cost of a 6 month waterway closure at between $13.7 and $235 million dollars. A $100 million dollar shift in consumers discretionary spending in to spending on petroleum products, over a 2 year period, is a conservative estimate of the savings from prevention of a catastrophic allision. This estimate is based on the sharp increase of inbound transportation cost as the supply system becomes dependent on trucks. The MDOER report is available in Appendix H of the PCR or Encl 8 of this report.

-18-

E. Other Benefits

1. Replacement of the CSB will permit domestic oil refineries (US Gulf states) to compete more effectively with foreign refineries for US Northeast fuel markets. Under the Jones Act only US flag tankers can pick-up product at US ports and deliver to another US port. Chelsea River operators report that 50% of the time their requests for pick-up and delivery of US Gulf oil are not met because of a lack of availability of US flag tankers.

Due to this lack of US flag tanker availability Gulf refineries and their customers on Chelsea River are forced to rely on time consuming, higher cost transportation methods. Today, 90% of US Gulf refined product arrives in New York via pipeline from Texas. From New York it is then loaded on to barges or coastal tankers for the trip up to Boston Harbor and Chelsea River. The 30 day delivery timeline for US product, arriving via pipeline, is extremely costly (in terms of the time value of money) in comparison to foreign purchases which can be delivered reliably within 1 week.

The CSB limits the sales of US refineries in the Northeast market as well as the ability of the US Jones Act tanker fleet to operate effectively in the domestic coastwise trade.

2. Massachusetts Division of Energy Resources (MDOER) estimates that in the event of a six month waterway closure, caused by a catastrophic vessel allision, a loss of 1,949 jobs would be expected as consumers reduce spending to offset the increased costs of fuel as well as the state and local governments losing tax revenue from lost income (see MDOER report in PCR or Encl 8 of this report).

Encl. (7) of this report also contains formulae for navigation benefits. Additional descriptions of methodology for WARS, TTS, BES, and COS are found in Section VIII of the PCR (encl 9), entitled Computation of Navigation Benefits.

## X. NAVIGATION BENEFIT COMPUTATIONS

Summary: Annualized Navigation Benefits

| | | |
|---|---|---|
| I. | WARS 1 Vsl/Bridge Allision Damage Reduction | $   492,328 |
| | WARS 2 Time Delay Cost | $ 1,700,198 |
| | WARS 3 Vehicle Operating Cost Increase | $ 1,097,478 |
| | WARS Total | $  3,290,004 |
| II. | TTS 1 Product Vsl Transit Delay Savings | $   245,426 |
| | TTS 2 Tanker Assist Tug Transit Differential Savings | $   277,822 |
| | TTS 3 Tug & Barge Assist Tug Transit Differential Savings | $_____49,937 |
| | TTS Total | $    573,185 |
| III. | Benefits Economy of Scale | |
| | BES 1 Tanker 35-50 DWT Foreign | $ 5,715,351 |
| | BES 2 Tanker 35-50 DWT U.S. | $   762,928 |
| | BES 3 Tanker 50-80 DWT Foreign | $ 3,974,642 |
| | BES 4 Tanker 50-80 DWT U.S. | $___676,375 |
| | BES Total | $ 11,129,296 |
| IV. | COS 1 Inbound Anchorage Delay Costs | $   397,499 |
| | COS 2 Mobil Terminal/Draw Realign Savings | $   384,912 |
| | COS 3 Outbound - Delay Costs | $ 1,545,362 |
| | COS 4A Cost Extra Tugs Assist Tankers | $    42,768 |
| | COS 4B Cost Extra Tugs to Assist T & B | $   269,616 |
| | COS 5 Design/Const. Saving US Flag Ships | $ 12,381,000 |
| | COS 6 Design/Const. Saving Foreign Flag Ships | $ 24,762,000 |
| | COS 7 Prevention of Catastrophic Allision | $ 50,000,000 |
| | COS Total | $ 89,783,157 |
| | Navigation Benefit Total | $104,775,642 |

## XI. DISTRICT FINDINGS

A.   It is the First Coast Guard District's finding that the Chelsea Street Bridge is an unreasonable obstruction to navigation and qualifies for replacement under the Truman Hobbs Act of 1940.

B.   Minimum Bridge Clearances for Replacement Bridge

The minimum horizontal clearance for the bridge is 380' and a minimum vertical clearance of 175' in the full open position. However consideration should be given to totally spanning the waterway and providing a vertical clearance of 185' if depth of structure permits the towers to be under the 250' height approved by FAA. The Distance between abutments of the present bridge is approx. 446 feet. The abutments are on the banks of Chelsea River.

In determining the minimum horizontal and vertical clearance for a replacement Chelsea Street Bridge, the future trends and needs of navigation for at least the next 50 to 75 years were anticipated. The following basic assumptions were made:

1. Boston Harbor is and will continue to be a major New England port for receipt of cargo and petroleum products.

2. Chelsea River (Creek) will continue to be a key distribution point for petroleum products.

3. Improvement of Boston Harbor channels will continue and vessels with drafts up to 45 feet will routinely visit Boston.

4. The McArdle Street Bridge will be replaced.

5. Tanker beams will increase due to OPA-90 requirements, berth/length restrictions, and environmental laws.

6. Requirement for assistance of at least 2 tugs will continue.

7. Of major importance is to maintain free flow for both marine and land transportation during construction.

8. Existing bascule span must remain fully operational during construction and closures to marine traffic minimized with maximum period, less than 60 hours at any single time.

-21-

Presently tankers going upstream of the bridge are limited to 90.5' beam. As noted in the Preliminary Case Report the beam, length and draft of the world tanker fleet were analyzed by deadweight tonnage (DWT). Vessels over 100,000 DWT are not anticipated to use Boston Inner Harbor. Today tankers in the 40K to 100K DWT size have beams (widths) from 85 to 157 feet with a large number in the Panamax (105-106') beam class. However, since almost none of the petroleum products bound for New England is transported through the Panama Canal wider beam vessels have been built to minimize vessel drafts, lightering of vessels and to accommodate off-loading dock length or draft restrictions. OPA-90 double hull and double bottom requirements will cause vessels with beams less than 135' to increase their overall width by about 12 feet. Vessels with beams greater than 135 are anticipated to be able to reconfigure vessel compartments without loss of carrying capacity or an increase in beam. This will mean that the average tanker will have a beam of 105'-125' for 40K to 100K dwt tankers. However, several tankers with beams of 157' and length of approximately 690 have been specially built to service the Northeast.

The waterway in the vicinity of the existing bridge is approximately 445 feet wide. In applying the Corps of Engineers criteria for the design of channels, it becomes readily apparent that the minimum horizontal clearance for the bridge should be the width of the waterway.

The Corps of Engineers Manual EM 1110-2-1613 entitled "Hydraulic Design of Deep-Draft Navigation Projects" was used as one method of analyzing the minimum horizontal clearance for a proposed bridge. Deep-Draft channels are ones which provide for the movement of vessels with drafts of more than 15 feet and which are designed for open-water navigation. Table 7-1 General Criteria for Channel Widths is reproduced below for information and reference.

Table 7-1

General Criteria for Channel Widths

Minimum Channel Width in % of Beam

| Location | Vessel Controllability | | | Channels with |
| | V. Good | Good | Poor | Yawing Forces |
| --- | --- | --- | --- | --- |
| Maneuvering Lane, straight channel | 160 | 180 | 200 | Judgement |
| Bend 26-degree Turn | 325 | 370 | 415 | Judgement |
| Bend 40-degree Turn | 385 | 440 | 490 | Judgement |
| Ship Clearance | 80 | 80 | 80 | 100 but not less than 100' |
| Bank Clearance | 60 | 60+ | 60+ | 150 |

Table 1 below provides minimum channel widths for one-way traffic movement by ocean-going tankers in a straight channel with good maneuverability and under control of a skilled and diligent pilot. Under these conditions the maneuvering lane width is 160% of the design vessel beam. This value is applicable for channels with no cross-currents or cross-winds, both of which are encountered at this site. The Corp's study also notes that additional width allowance should be made for congested channels or channels expected to have traffic with hazardous cargoes. The latter is applicable. Thus, the minimum standards would not apply for Chelsea Street Bridge.

Table 1

| Vessel Width | Bank Cl (70%) | X2 | Maneuver Good | Lane Poor | Straight Good | Channel Poor |
|---|---|---|---|---|---|---|
| 105 | 74 | 148 | 189 | 210 | 337* | 358 * |
| 125 | 88 | 176 | 225 | 250 | 401 | 426 |
| 135 | 95 | 190 | 243 | 270 | 433 | B-B |
| 157 | 110 | 220 | 283 | 314 | B-B | B-B |

Note:    B-B    Bank to Bank- value exceeds width of waterway

* Due to the hazardous cargoes carried and in order for tugs to be fully effective they should remain tied up one each side of the vessel and be able to extend out at a 90 degree angle when necessary. Therefore minimum horizontal clearance should be 380'.

However, the present and proposed bridge is considered located on a bend in the waterway because the straight reach approaching the bridge from each side is less than 5 times the length of the longest ship (800') anticipated to use the waterway. Applying that criteria the available bank to bank clearance requirements is exceeded in all cases for the optimum channel.

If a bank to bank approach is not taken then the draw needs to be aligned so that marine traffic can have easy access whether a vessel is moored at the Mobile Terminal downstream or not.

An additional factor that can be considered in determining the width and location of the opening is the existing bulkhead for the Northeast Petroleum Corporation's Old Jenny Dock. This could permit the tower piers to project about 40-50' inside the Chelsea Bank. Similarly, the tower piers on the East Boston side could be built slightly (10-20') off the East Boston Bank due to the bulkhead alignment of the MWRA facility. However, the effect of the counterweight arc and the ability to fully open the bascule span has to be kept in mind. But, it is not recommended that the horizontal clearance be less than 380' between fenders.

-24-

In the open position a vertical lift bridge should provide a minimum vertical clearance of 175' above MHW. If obtainable a vertical clearance of 185' above MHW would be preferred as long as the towers would not have to exceed 250' above MSL. This is due to the close proximity to the airport. FAA has approved 250' towers. The vertical clearance in the closed position is not as critical as the other clearances. However, the vertical clearance in the closed position should be above the 100 year flood and should be able to accommodate small recreational or patrol type vessels with air draft of 8-10'.

## XI. DISTRICT RECOMMENDATIONS

1) That the Chelsea Street Bridge be altered to provide for the free, easy, and unobstructed passage of present and future navigation on Chelsea River, pursuant to the Truman-Hobbs Act of 1940.

2) That a vertical lift bridge be chosen over other bridge types due to mitigation of construction impacts, cost, and operation considerations. See Appendix D of the PCR for a detailed discussion of the advantages of the vertical lift design.

3) That the replacement bridge provide a minimum horizontal clearance of 380 feet; a minimum vertical clearance in the open position of 175-185 feet at MHW and 8 to 10 feet at MHW in the closed position.

Encl. (7): <u>CALCULATION OF BENEFITS (FORMULAS)</u>

A.    <u>WARS</u>

    1. WARS 1 - Vessel/Bridge Allision Damage Reduction

        a. WARS Table #1 on page 33 of PCR (encl 9) provides the annual damages to the vessels, the Chelsea Street Bridge structure and its fender system. The yearly accident costs are adjusted to 1991 dollars using FHWA structures index.

        b. Annualized Cost = .9 (Total Damage (1991 $)/20) The .9 multiplication factor is used because the increase in bridge width is intended to eliminate 90% of the bridge allisions and all of the catastrophic ones.

    2.    WARS 2: Time Delay Costs.

        a.    The formula incorporates accepted FHWA principles of time valuation.

        b.    WARS TABLE 2A in the PCR provides the various values used in determining the yearly time delay costs ($TDC_y$). The formula used to calculate the $TDC_y$ is given below:

$$TDC_y = D_O \times P_C \left(\frac{M}{60} \times \frac{PWR}{2}\right) + D_O \times OP_C \left(\frac{M}{6} \times \frac{PWR}{2}\right) + D_O \times OP_t \left(\frac{M}{60} \times TW\right)$$

Where:  $TDC_y$ - Time Delay Cost for a specific year i.e. 1975
        $D_O$ - Days of Outage
        Pc - Peak hour ADT for Cars
        M - Additional time in minute to transit detour
        PWR - Prevailing Wage Rate - Boston/Chelsea
        $OP_C$ - Off-peak ADT for cars
        $OP_t$ - Off-peak ADT for trucks
        TW - Average Trucker wage - Boston/Chelsea

Example:

$$TDC_{75} = 210 \times 5178 \left(\frac{20}{60} \times \frac{\$5.20}{2}\right) + 210 \times 5562 \left(\frac{10}{60} \times \frac{\$5.20}{2}\right) +$$

$$210 \times 1390 \left(\frac{10}{60} \times 6.78\right)$$

$$TDC_{75} = 942,396 + 506,142 + 329,847 = 1,778,385$$

3. WARS 3: Vehicular Operating Costs

    a. WARS Table 3A provides the various values used in determining the added yearly vehicle operating costs ($AOC_y$) due to cars and trucks having to be rerouted when the CSB was out of service due to vessel allisions. The car and truck operating costs are comprised of fuel cost, oil, maintenance, depreciation and insurance on a cents per mile basis. The formula used to calculate $AOC_y$ is given below:

$$AOC_y = (D_o \times ADT_c \times AM \times C_{oc}) + (D_o \times ADT_t \times AM \times T_{oc})$$

Where: $AOC_y$ - Added Operating Cost for specific year

        $D_o$ - Days bridge out of service during year

        $ADT_c$ - Average Daily Traffic - Cars

        $ADT_t$ - Average Daily Traffic - trucks

        AM - Added miles which equals 3.2 to 7 miles (3.2 used)

        $C_{oc}$ - Car operating cost in cents/mile

        $T_{oc}$ - Truck operating cost in cents/mile

    b. WARS Table 3B summarizes the car and truck vehicle operating costs by year. The yearly totals are then again multiplied by the Consumer Price Indexes for Transportation to put all costs in 1991 dollars so they could be annualized. From WARS Table 2B the total time delay in 1991 dollars is $34,003,955 and the added vehicle operating cost from WARS table 3B in 1991 dollars is $21,949,569.

### WARS 20 YEAR BRIDGE ALLISION COSTS

WARS 1 - Vessel/Bridge Damage Cost = 10,940,612

WARS 2 - Total Time Delay = 34,003,955

WARS 3     Added Vehicle Operating Cost = 21,949,569

Total WARS annualized navigation benefit = $3,290,004

WARS = (.9) WARS 1 + WARS 2 + WARS 3

WARS = $492,328 + $1,700,198 + $1,097,478

WARS = $3,290,004

B.  Transit Time Savings

    1. TTS 1 Product Vessel Transit Delay Savings

        a. TTS Table 1 of the PCR presents the transit time savings (TTS) for MT, T&B, and Tankers. The total delay cost for each type unit was determined using the following formula: Annual passages X (minutes of delay/60) X hourly operating costs.

    Data for 1989 and 1990, were calculated and then averaged for a total average delay cost for each type of vessel. The total average delay cost was then doubled to account for both inbound and outbound delays.

    2. TTS 2 Tanker Assist Tug Differential Savings

        a. TTS Table 2 of the PCR presents transportation time savings when tugs assist a tanker bound upstream of the CSB. Tug rates are based on pier locations, day of the week, and the time of day on a per tug transit basis.  A different average rate exists for vessels being moved to points above or below the CSB. Averaging the rates shows that the CSB accounts for an increased cost of $243 per tug/transit.  Using bridge logs, it was determined that approximately 3.7 tugs were used per tanker bridge transit.  Thus a transportation time savings for tugs attending tankers is calculated as follows:

    $243 per tug/per transit X 3.7 tugs X #of tanker transits.

    These calculations were made for 1989 and 1990.  The two TTS values were averaged and then the average doubled to account for inbound and outbound trips.

    3. TTS 3 T&B Assist Tug Differential Savings

    TTS Table 3 of the PCR presents the transit time savings when T&B units are required to have assist tugs when transiting the CSB.  The same cost differential of $243 per tug/transit applies as for TTS Table 2 of the PCR.  The following formula was used to calculate the TTS for tugs assisting T&B units:

    # extra tugs X per tug/per transit differential operating costs.

    Data from two years, 1989 and 1990, was used and an average was taken to determine the average TTS for tugs assisting T&B units.  Since an actual count was taken during both inbound and outbound transits, the savings is not double as in TTS 1 and 2.

Total TTS annualized navigation benefit

TTS = TTS 1 + TTS 2 + TTS 3
TTS = $245,426 + $277,822 + $49,937
TTS=$573,185

## C. BES: Benefits of Economy of Scale

BES 1-4: The cost per long ton to transport fuels in a 50 DWT vessel was subtracted from the higher cost (per long ton) of transporting fuels in the 35 DWT vessel. This difference is listed as 35 - 50 DWT. The same subtraction was done for the differing transportation cost of 50 and 80 DWT vessels. US and Foreign flag BES were calculated separately because of the significantly higher operating cost of US flag vessels and greater reliance on foreign supplies. For a detailed discussion of methodology used to calculate BES see the PCR pg. 54-81.

## D. COS: Certain Other Savings

1. COS 1: Anchorage Delay Cost

Hours
Delay    X    Vessel
Passages    X    In Port
Operating Cost/Hr =    Anchorage Delay Cost

2. COS 2: Mobil Terminal Delays

# of Delays    X    Average
Hours Delay    X    At Sea 35 DWT
Operating Cost

3. COS 3: Daylight, Tide, and Ballast Delays-Outbound

Avg.
Delay    X    Vessel
Passages    X    At sea vessel
Operating Cost    =    Total
Delay Cost

4. COS 4a: Cost of Extra Tugs Assisting Tankers

Extra
Tugs    X    Tug Operating Cost
per Transit/per Tug    =    Total Cost of Extra Tugs

COS 4b: Cost of Extra Tugs to Assist T&B Units

#Extra
Tug Trips    X    Tug Operating Cost
per Transit    =    Total Extra
Tug Cost

5/6.   COS 5/6: Design/Construction Saving US/Foreign Flag Ships

        a.US Flag Design/Const. surcharge:
Replacement Cost (RC) of a US Flag 35 DWT tanker (see Appendix G of the PCR for ACOE cost data) is $61,905,000.
RC   X   2 SHIPS   X   10%  DESIGN/BUILD SURCHARGE = $12,381,000

        b.Foreign Flag Design/Const. surcharge:
RC of a Foreign Flag 35 DWT tanker is $24,762,000.
RC   X   10 SHIPS   X   10% DESIGN/BUILD SURCHARGE = $24,762,000

    7.   COS 7: Savings From Prevention of Catastrophic Allision
Based on MDOER estimate of the cost of a waterway closure.
MDOER estimates this cost at $100,000,000  over a 2 year period.
$100,000,000  divided  by  2  =  $50,000,000 annualized benefit.

# EXHIBIT B

Page 1

VOLUME I                              Pages 1 to 74

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CA Nos.   03-12416-RWZ

03-11651-RWZ

- - - - - - - - - - - - - - - - - - - - - - - - x

CITY OF BOSTON,

Plaintiff,

vs.

K-SEA TRANSPORTATION, LLC,

and K-SEA TRANSPORTATION CORP.

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - x

CA No.   03-11666-RWZ

- - - - - - - - - - - - - - - - - - - - - - - - x

CITY OF BOSTON,

Plaintiff,

vs.

RED STAR TOWING & TRANSPORTATION

COMPANY, INC., REINAUER TRANSPORTATION

COMPANIES, LLC, HYGRADE OPERATORS, INC.,

and BOSTON TOWING COMPANY,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - x

Page 9

1   concerning that bridge have sort of come under you as

2   Commissioner of Public Works for the City of Boston;

3   is that correct?

4        A.   Yes, that's very correct.

5        Q.   When did you first, if you can recall,

6   become aware that there were some issues with a high

7   number of allisions with that bridge?

8             MR. FINN:  Objection.  Go ahead and answer

9   it.

10       A.   Oh, that was a long time ago, when I first

11  came in 1968.  I couldn't possibly tell you the month

12  or the day or what have you, but the situation with a

13  narrow channel opening through the Chelsea Street

14  Bridge was made known to me real early in the game

15  and the problems associated with vessels getting

16  larger and larger and that opening being 100 feet or

17  just a little less, and I was aware of that for many,

18  many years.

19       Q.   So shortly after you became appointed as

20  Commissioner of Public Works for the City of Boston,

21  did the issue of the opening of the channel within

22  the Chelsea Street Bridge and the size of vessels

23  applying the waters under that bridge was made known

24  to you; is that a fair statement?

Page 11

1   various bridges, the two, McArdle and the Chelsea.

2                The Chelsea, because of its

3   narrowness, especially as the vessels got larger, was

4   unable to do that.  They couldn't put tugboats on

5   both sides of the bridge and guide it through which

6   required an extra knowledge of the captain or whoever

7   was in charge of the vessel when it went through

8   there.  They were more than aware of it and had to

9   just exercise extra caution going through that narrow

10  slip.

11      Q.   Did you become aware at some point after

12  you took over there was an investigation undertaken

13  by the United States Coast Guard on under the Truman

14  Hobbs Act with respect to the Chelsea Street Bridge?

15      A.   Yes.

16      Q.   Do you recall the general time frame in

17  which that investigation was commenced by the United

18  States Coast Guard?

19      A.   Well, you're referring to as an

20  investigation.  I guess that's an acceptable term.  I

21  was having many conversations with the, I guess you

22  would have called him the in charge of the bridges in

23  this region, can't remember the name at the moment,

24  but it was followed up by a mandate or an order, if

Page 18

1  and get going.

2           But when Mr. Romney made that fine

3  suggestion, that he would pay the bill, then the

4  control, and the answers to those questions can best

5  be determined by the people who are going to

6  advertise an award.  Certainly the City is going to

7  play a major role in knowing what's going on, but

8  without being bureaucratic, I don't have control of

9  that decision.  I am not the person now that we've

10 changed the plans and specs and sent it over to the

11 Mass. Department of Public Works, Mass. Highway

12 Department.  I'm not the person that can give the

13 marching order to say, "Advertise it this week."

14    Q.  So within the last couple of years, the

15 Commonwealth of Massachusetts made the offer to fund

16 the new bridge construction and that was accepted by

17 the City of Boston; is that correct?

18    A.  Yes.

19    Q.  And at present time, I gather in what

20 you're saying, it's up to the Commonwealth and the

21 people who deal with it, this issue at the

22 Commonwealth, to decide when this project is going to

23 go out to bid; is that essentially what's happening?

24    A.  Yes.  I mean, there is no discord between

Page 20

1   those would be my initial suggestions.

2          MR. CHIARELLO:  Can you spell any of those

3   for the record?

4          THE WITNESS:  No.  I just don't know

5   Luisa's spelling.

6      Q.   As far as you know, though, the project is

7   at some point in the future going to go forward, this

8   bridge will be rebuilt according to designs that meet

9   the order to alter that was issued back in 1992 by

10  the United States Coast Guard?

11     A.   Oh, most certainly, most certainly.

12     Q.   Now, in terms of funding for this new

13  project, I understand that you've indicated the

14  Commonwealth has agreed to pay for it.  Will Truman

15  Hobbs money be included in that or is this entirely a

16  project to be funded by the Commonwealth of

17  Massachusetts?

18     A.   Great question.  The Truman Hobbs money in

19  some recent meetings, I'm talking within the last,

20  three, four months, we had meetings with the Coast

21  Guard, Federal Highway Administration, and the Mass.

22  Highway Department, and there was legislation being

23  drafted by the United States Coast Guard to see if

24  the Truman Hobbs money could be passed from the Coast

Page 22

1    be very involved, and I'm going to use some Truman

2    Hobbs money for that, if the legislation goes as

3    proposed.

4         Q.    The City is the entity required to comply

5    with the Truman Hobbs order to alter, and for that

6    reason, you have made a determination that the City

7    needs to be involved in the construction management

8    of this bridge when the work is done; is that fair to

9    say?

10        A.    That's fair to say, yes.

11        Q.    At present time, is there any money from

12   the City that's envisioned to be expended in this

13   project, whenever it may take place, aside from

14   anything that may be turned over under Truman Hobbs

15   as you have requested?

16        A.    I think not.

17        Q.    With respect to when the project is going

18   to go forward, as far as you know at present, that's

19   a decision that is going to be made by the

20   Commonwealth; is that correct?

21        A.    That's correct.

22        Q.    Now, are you involved in any decision

23   making as to whether and what type of repairs to the

24   bridge in its present state may or may not be made up

1          So it was that imminent, and I do

2    remember, as I say, not big, earth shattering, to

3    say, let's just hold off.  There is no sense in

4    making whatever the estimate of repairs would have

5    been and then watch it got torn out in a relatively

6    short time frame.

7      Q.   So you say there were no big discussions

8    but some level of decision making there?

9      A.   Oh, yeah.  It was conscious.  There was no

10   question it was conscious, but it just fell into the

11   category, we had so many discussions going on with

12   the bridge and the Corps of Engineers and everybody

13   and their brother, it just seemed it was a safe

14   condition, usually.

15          I don't know what happened here.  I

16   don't see it on a day by day basis, but usually when

17   one of these takes place, it's checked out, and if

18   there is anything broken, divers go down, make it

19   safe, anything else, and you move on and either make

20   a repair or not.

21          And in this particular instance, we,

22   as I say, felt it would be being torn out and still

23   hope that will be torn out.  I do think we lost some

24   months because of the two or three issues that came

Page 35

1   occur with some degree of frequency until the order

2   could be complied with?

3       A.   I don't know if there was discussions, were

4   just a fact of life.  There were allisions before the

5   order, there were allisions after the order, and none

6   of that -- well, the answer to your question, again

7   is, I guess I can speak for myself, that if anybody

8   had asked me, "While you're waiting for the Truman

9   Hobbs funding is there a possibility of more

10  allisions before it's ready to be advertised?"  I

11  would have said, "Very probable, hopefully not too

12  often, because there is thousands of vessels that go

13  through there without allisions."  But I guess I'm

14  saying too many words.

15              But, yeah, I never knew it was going

16  to take so many years to get Truman Hobbs funding.

17  As I say, I learned that term the day they made it

18  available to me and never spent five minutes of a

19  relatively long career knowing how it works but know

20  now it's an extremely slow funding source.  That's

21  what I can tell you.

22      Q.   Now, did you have the opportunity before

23  you came here today to review the testimony of Jim

24  Burke?

Page 38

1    bridge in the channel to approach the second bridge,

2    your tail end can cause some kind of problems back at

3    Chelsea Street as they're trying to adjust to make

4    their next run.  I learned those two things.

5              As far as the tugboats are concerned,

6    it's my belief, stand to be corrected, it's my belief

7    that ideally you could take a certain size vessel,

8    and I'm sure there are some, there are certain

9    vessels where you can have a boat in one corner, a

10   tugboat in one corner, and they can steer it through.

11             But once you get to a certain width

12   and there is no room, the tugboats lose control, if

13   you will, of it going through the slip, and that's

14   where mother nature, wind, everything else, could

15   take over and whoever is captaining it through that

16   slip.  I think I know that.

17        Q.   Are you involved at any level in making

18   decisions as to prosecution of this litigation

19   against the various Defendants or would that be some

20   other department within the City of Boston?

21        A.   Oh, no.  As long as I've been there, long

22   before I met John Finn who's representing the City at

23   this particular junction.

24             MR. ZONGHETTI:  Very fine lawyer, by the

Page 49

1          MR. ZONGHETTI:  We'll mark that Exhibit 1.

2          (Exhibit 1 marked for identification)

3     Q.    Do you see you wrote way back when in 1992?

4     A.    November 2, 1992, that's my signature and

5  says that, "The City takes no exception to the

6  unreasonable obstruction determination regarding

7  Chelsea Street Bridge.  I look forward to cooperating

8  with the Coast Guard to developing an acceptable

9  plan," yes, I read that.

10    Q.    As a result, was the City aware since 1992

11 that the Chelsea Street Bridge represented an

12 unreasonable obstruction to navigation?

13    A.    They found it was unreasonable obstruction

14 for navigation and the City agreed.  We don't take

15 exception to it.  Why?  Don't ask that question.

16    Q.    Do you agree with the question?

17    A.    Do I agree with what I signed the letter

18 on?

19    Q.    There was no question, but that the Chelsea

20 Street Bridge, at least since that time, represented

21 an unreasonable obstruction to navigation?

22    A.    To some navigation, right, some navigation.

23 I started to make a deal out of it, but there was no

24 sense -- the Chelsea Creek is critical from the point

# EXHIBIT C



Volume: I
Pages: 1-172

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 03-12416-RWZ
and
C.A. No. 03-11651-RWZ

CITY OF BOSTON,

        Plaintiff

vs.

K-SEA TRANSPORTATION, LLC and
K-SEA TRANSPORTATION CORP.,

        Defendants

and                        C.A. No. 03-11666-RWZ

CITY OF BOSTON,

        Plaintiff

vs.

RED STAR TOWING & TRANSPORTATION COMPANY,
INC.; REINAUER TRANSPORTATION COMPANIES,
LLC; HYGRADE OPERATORS, INC. and BOSTON
TOWING & TRANSPORTATION COMPANY,

        Defendants

TELEPHONE DEPOSITION OF:  JAMES J. BURKE

CLINTON & MUZYKA
One Washington Mall
14th Floor
Boston, MA 02108

February 1, 2006

Virginia Dodge
Registered Professional Reporter

DUNN & GOUDREAU

Page 11

1    various bridges, the two, McArdle and the Chelsea.

2             The Chelsea, because of its

3    narrowness, especially as the vessels got larger, was

4    unable to do that.  They couldn't put tugboats on

5    both sides of the bridge and guide it through which

6    required an extra knowledge of the captain or whoever

7    was in charge of the vessel when it went through

8    there.  They were more than aware of it and had to

9    just exercise extra caution going through that narrow

10   slip.

11       Q.    Did you become aware at some point after

12   you took over there was an investigation undertaken

13   by the United States Coast Guard on under the Truman

14   Hobbs Act with respect to the Chelsea Street Bridge?

15       A.    Yes.

16       Q.    Do you recall the general time frame in

17   which that investigation was commenced by the United

18   States Coast Guard?

19       A.    Well, you're referring to as an

20   investigation.  I guess that's an acceptable term.  I

21   was having many conversations with the, I guess you

22   would have called him the in charge of the bridges in

23   this region, can't remember the name at the moment,

24   but it was followed up by a mandate or an order, if

Q.    And if I understand your testimony correctly,
there's some degree of discretion on the part of the
bridge tender as to whether they document a scrape or not;
is that correct?

A.    That's correct.

Q.    And am I also correct that there's nothing written
about, you know, when they should document a scrape?  It's
up to these folks to determine based upon their experience
when something seems more like a damaging scrape than a
non-damaging scrape?

A.    Yes.  That's correct.

Q.    Let me ask you, what is the horizontal span of the
bridge, Chelsea Street Bridge, presently?  Is that about
96 feet?

A.    I believe it's 96.5.

Q.    And what type of vessels go through that bridge or
under that bridge, rather?  Or through, I guess.

A.    Through the bridge.  There are tankers.  Barges,
tugboats of various sizes.  The largest tanker allowed
through the Chelsea Street Bridge is 90.5 beam.

Q.    And when you say "allowed," are there rules printed
somewhere as to what's allowed through?

A.    I don't know that for sure.  I believe the Coast
Guard has some regulations on that, but I don't -- not the

1    City of Boston.

2    Q.    So that would be the largest vessel allowed through

3    the bridge based upon whatever rules there are, 90.5 feet?

4    A.    Correct.

5    Q.    And that would leave -- in that instance for

6    90.5-foot, that would leave 6-foot clearance?

7    A.    Correct.

8    Q.    And with respect to tugboats and barges, is it often

9    the case that tugs will come -- or barges will come

10   through with more than one tugboat assisting?

11   A.    Yes.

12   Q.    I assume that you've actually seen on many, many

13   occasions vessels going through this bridge?

14   A.    Yes.

15   Q.    And you indicated earlier in your testimony, if I

16   got it correctly, that vessels scrape the bridge many

17   times; is that correct?

18   A.    That's correct.

19   Q.    And I haven't seen this happen because I'm not up

20   there, but I've been told -- and there will be a question

21   at the end of this -- I've been told that it's not

22   uncommon for vessels, whether it's tug or a tanker, to

23   literally rest up against the bridge as they're going

24   through?

```
1    A.    Correct.

2    Q.    And that's because even the best navigators, given

3    the tight quarters there, literally need, on occasion,

4    given the tide, the wind and what have you, to rest up

5    against the bridge to make it through?

6              MR. FINN:  Objection.

7              Go ahead.

8    A.    Correct.

9    Q.    (By Mr. Zonghetti)  That's something you've seen,

10   and you've spoken to these folks, right?

11   A.    I don't know if I've spoken to them, but I have seen

12   it.

13   Q.    And is there anything that the City of Boston does

14   to prevent vessels from resting up against the bridge as

15   they go through?

16             MR. FINN:  One second.  Gino, I'm going to

17        just object because you're referring to resting

18        up against a bridge, and I'm assuming you

19        really mean the fender.

20             MR. ZONGHETTI:  You know what, John?  I

21        appreciate it.  You're right.

22             MR. FINN:  I'm not trying to mess this up.

23             MR. ZONGHETTI:  No.  It's important to be

24        accurate.
```

1  Q.    (By Mr. Zonghetti)  If we can go back, I was -- I

2  did mean the fender, and I assume that's what you're

3  answering?

4  A.    Yes.  The fender.  Mm-hmm.

5  Q.    Does the City of Boston do anything to prevent that

6  from happening, or they allow the vessels to rest up

7  against, if they need to?

8          MR. FINN:  Objection.

9          Go ahead.

10 A.    No.  The City of Boston does not object to that.

11 No.

12 Q.    (By Mr. Zonghetti)  And I assume they don't object

13 to that because they deem that a necessary practice to

14 safely get through that tight span; is that correct?

15         MR. FINN:  Objection.

16         Go ahead.

17 A.    Yes.

18 Q.    (By Mr. Zonghetti)  Are the vessels that come

19 through, the tankers and the tugboats, which would be the

20 navigational vessels coming through, do they have to have

21 pilots on board?

22 A.    The tankers, yes.  I'm not sure about barges.

23 Q.    Okay.  And the pilots are members of what pilots

24 association?  Do you have any idea?

DUNN & GOUDREAU

1    A.    Yes.    The Boston Harbor Pilots Association.

2    Q.    And these are folks that are specialized in

3    transiting the waters up that way?

4    A.    That's correct.

5    Q.    And I assume that's the reason that these folks have

6    to be on board to get the tankers through?

7    A.    Yes.

8    Q.    What is the new bridge that's been designed?  Do you

9    have any idea what the horizontal span of that is supposed

10    to be?

11    A.    The channel, I believe, is over 200 feet wide.

12    Q.    And the span between the bridge, is that about

13    380 feet in design?

14    A.    Yes.

15    Q.    So the new bridge would be -- the span would be a

16    difference of between 96.5 and about 380 feet?

17    A.    Something like, yes.

18    Q.    And what is the navigable channel now between the

19    span of the bridge?  Do you have any idea?

20    A.    96.5.

21    Q.    That's the navigable channel?

22    A.    That's from fender to fender.

23    Q.    So the channel as it's presently constituted goes

24    from fender to fender?

1    A.    Correct.

2    Q.    So a vessel going through the Chelsea Street Bridge

3    can literally be in the channel and pressing up against

4    the fender system; is that correct?

5    A.    Yes.

6

7                    (Off-record discussion.)

8

9    Q.    (By Mr. Zonghetti)  In your experience -- where do

10    you work out of?  Do you work at the Chelsea Street

11    Bridge, or do you work somewhere else in an office?  I

12    mean, you don't work anymore, so that's probably a bad

13    question.

14    A.    I did not work --

15            MR. FINN:  Mr. Zonghetti, before you went

16        on to that last one, the witness turned to me

17        and was saying something to me about the last

18        question.

19    Q.    (By Mr. Zonghetti)  Why don't you put it on record

20    and if we need to go further with it --

21    A.    I'm not 100 percent sure that the navigable channel

22    is 96.5.

23    Q.    Okay.  You just don't know the answer to that?

24    A.    Correct.

1  Q.    Fine.  Where did you work out of, sir?

2  A.    I worked out of an office, the Public Works office,

3  at 400 Frontage Road in South Boston.

4  Q.    Okay.  And how often would you physically get to the

5  Chelsea Street Bridge during the course of a normal

6  workweek, let's say?

7  A.    Most every day.  Sometimes three times a week.

8  Q.    And would you go to the other 40-some-odd bridges on

9  that occasion, or was -- that number of times, or was the

10  Chelsea Street something that you would do a little bit

11  more than others or --

12  A.    Well, the four movable bridges took up 95 percent of

13  my time.

14  Q.    Okay.  Were any of the other movable bridges -- are

15  any of the other -- I'll withdraw that.

16        Were any of the other movable bridges that you had

17  to deal with and manage or supervise in Boston declared to

18  be unreasonable obstructions to navigation at any point?

19  A.    Not to my knowledge.

20  Q.    Are you able to quantify in any sense the difference

21  in the number of allisions that the City of Boston has

22  experienced between the Chelsea Street Bridge and the

23  other three bridges, I guess?  Was it three others or

24  four?

```
 1   A.    Three.

 2   Q.    Three others that you supervised?

 3   A.    Correct.

 4   Q.    Was there a difference in the number of allisions

 5   between those bridges?

 6   A.    Yes.

 7   Q.    And could you describe as best you can the

 8   difference?  I assume there were more at the Chelsea

 9   Street Bridge?

10   A.    Yes.

11   Q.    And can you give me an order of magnitude?

12   A.    Oh --

13         MR. FINN:  I'm going to object to this, but

14         go ahead.

15   A.    Ten to one.

16   Q.    (By Mr. Zonghetti)  Ten to one, meaning --

17   A.    Maybe even more than that.  I mean, very, very

18   rarely does any other bridge have an incident.

19   Q.    And so the Chelsea Bridge was a particular, I

20   assume, cause of concern because of this problem with

21   allisions; is that fair to say?

22         MR. FINN:  Objection.

23         Go ahead.

24   A.    Yes.
```

DUNN & GOUDREAU

1    Q.    (By Mr. Zonghetti)  Beyond using the word "many" to

2    talk about the number of scrapes you personally witnessed

3    on whatever number of occasions you would be over at the

4    Chelsea Street Bridge, can you give me a number?

5    Thousands?  Hundreds?

6    A.    I would just -- I would just be guessing, but --

7             MR. FINN:  Well, don't guess.  If you can

8          give an estimate that you're comfortable with,

9          go ahead.

10   Q.    (By Mr. Zonghetti)  Yeah.  There's a very fine line

11   between best estimates and guessing, so -- so when you're

12   asking the questions, you say "best estimate," and your

13   attorney says, "Don't guess."

14         Are you able to give a best estimate?

15   A.    You know, not really.  I would -- it would be very

16   hard to put a number on it.  One a week.

17   Q.    One a week.

18   A.    A scraping, perhaps.

19   Q.    And that would be on the three times perhaps that

20   you were there a week?

21   A.    Oh, no.  I wouldn't say that.  No.  No.

22   Q.    What I'm saying is if you went there three times a

23   week, you would see one during those three times?

24   A.    Perhaps.

1    Q.    Okay.  Did you talk to bridge tenders who worked

2    there on a daily basis about how many scrapes they would

3    see?

4    A.    No.  That's not a topic of conversation.

5    Q.    Now, am I correct, in your experience, the many

6    years you worked supervising bridges in Boston,

7    particularly the Chelsea Street Bridge, that you've had

8    instances where, for example, a vessel allided with the

9    bridge and what was thought to be a minor allision ended

10   up with more damage than you anticipated?  Is that

11   something that you experienced?

12   A.    No.

13   Q.    No?  Did you have the reverse, where there was --

14   what was thought to be a pretty good hit of the bridge and

15   it was minor damage?

16   A.    On occasion, yeah.

17   Q.    And what I'm driving at, it's not always -- you're

18   not always able to judge whether there's going to be

19   damage or the amount of damage by the severity or the

20   perceived severity of the impact; is that a fair

21   statement?

22            MR. FINN:  Objection.

23            Go ahead.

24   A.    Yes.

DUNN & GOUDREAU

1    Q.    (By Mr. Zonghetti)  And sometimes in your

2    experience, there would be damage -- a vessel would strike

3    the Chelsea Street Bridge, and there might be damage that

4    was not visible to the naked eye at the time of the

5    allision?

6    A.    That's correct.

7    Q.    It might be below the waterline; is that correct?

8    A.    That's correct.

9    Q.    Or it might be internal, of internal structures that

10    were not readily seen by people who weren't surveyors and

11    things like that?

12    A.    That's correct.

13    Q.    Did the bridge tenders have any training in

14    identifying damage, or it was just based upon their gut

15    feeling based upon their experience, this was an incident

16    where there's damage, that sort of thing?

17           MR. FINN:  Objection.

18           Go ahead.

19    A.    Yeah.  That would be correct.

20    Q.    (By Mr. Zonghetti)  Now, you used the phrase in your

21    testimony "no visible damage" or something to that effect,

22    right?

23    A.    Yes.

24    Q.    You would say -- Mr. Chiarello was crucifying you

1   with those incident reports, and your response was, in

2   some instances, "no visible damage," and I assume that

3   means that at the time of the incident, whoever was

4   writing the report didn't see damage; is that correct?

5   A.    Correct.

6   Q.    And in instances where there was no visible damage,

7   I assume that's -- that would not result in a survey,

8   meaning if an incident occurred and a bridge tender wrote

9   it up as there being no visible damage, there would be no

10  reason to bring out a surveyor?

11  A.    That's correct.

12  Q.    Have you attended any meetings or had any

13  discussions with any of your peers or supervisors or

14  underlings at the City of Boston discussing the concept of

15  responsibility by vessels for damaging the Chelsea Street

16  Bridge, given that it's been declared to be an obstruction

17  to navigation?

18  A.    No.

19  Q.    That wasn't something that you've ever in your

20  career spoke to anyone about?

21  A.    No.

22  Q.    Bear with me a moment.

23        The vessels, the tankers and barges going through

24  this bridge, those are vessels that are carrying petroleum

1    products by and large?

2    A.    Yes.

3    Q.    And are there terminals upstream from the bridge

4    that have to be serviced?

5    A.    Yes.

6    Q.    So these vessels are by and large commercial vessels

7    that are transporting petroleum products, fuel or oil, to

8    these terminals as far as you know?

9    A.    Yes.

10    Q.    So it's necessary commercial traffic; is that fair

11    to say?

12    A.    Yes.

13    Q.    And when you've seen these, for example, tugboats or

14    tankers go through this tight span, is it fair to say that

15    they're typically going really dead slow speeds?

16    A.    Yes.

17    Q.    And that would be the only way you could really get

18    through there safely, I would assume?

19          MR. FINN:   Objection.

20          Go ahead.

21    A.    Yes.

22    Q.    (By Mr. Zonghetti)   Have you ever seen an allision

23    with one of these bridges take place?  I'll withdraw that.

24          Have you ever seen an allision with the Chelsea

1    Street Bridge take place?

2    A.    No.

3    Q.    And in instances where -- I'll withdraw that.

4          So you wouldn't be a witness, aside from possibly a

5    witness to damages, to any of the incidents that are

6    involved in the litigations that we're here for today; is

7    that correct?

8    A.    That's correct.

9    Q.    And you would have no reason to fault any of the

10   vessel operators; is that also correct?

11   A.    That's correct.

12   Q.    Now, with respect to the December 2, 2000 incident,

13   I believe that your testimony is that although surveyed,

14   the damage has not been repaired from that incident?

15   A.    That's correct.

16   Q.    And with respect to the December 2, 2000 incident,

17   there is some overlap with the September 5, 2001 incident;

18   is that correct?

19         MR. ZONGHETTI:   If someone would be kind

20         enough to show Mr. Burke --

21         MR. CHIARELLO:   Yeah.  He's got it.  We

22         just gave it to him.

23   A.    Yes.  There is some overlap.

24   Q.    (By Mr. Zonghetti)  The overlap would be -- I'm

1  looking at Exhibit 2 -- would be to the left side of that

2  marked-up fender system on the Chelsea side.  Do you see

3  that?

4  A.    Yes.

5  Q.    And that damage from the September 5, 2001 incident

6  was not repaired either; is that correct?

7  A.    That's correct.

8  Q.    Now, there are other instances in which some repairs

9  were effectuated after allisions.  I believe you testified

10 that after the February 26, 2004 incident, there was

11 repair; is that correct?

12 A.    Yes.

13 Q.    And I believe you also testified that after the

14 September 8, 2000 incident, there was some repair of

15 lights?

16 A.    That's correct.

17 Q.    What determination goes into whether repairs are

18 effectuated or not?

19 A.    The 9/8/2000 damaged a fender light, some fender

20 lights, and they have to be repaired immediately for safe

21 nav --

22 Q.    Would that be a light that would provide mariners

23 with notice of bridge?

24 A.    That's correct.

1    Q.    So that would be a real safety concern --

2    A.    Yes.

3    Q.    -- is that correct?

4    A.    Correct.

5    Q.    And that was in fact repaired immediately?

6    A.    Yes.

7    Q.    And do you know what the cost of that was?

8    A.    5,000?  Around $5,000.

9    Q.    Okay.  And in instances where other repairs were

10   effectuated, was that for similar reason, meaning that

11   there was some safety concern or some hazard to navigation

12   that gave rise to the thought that "We need to repair this

13   immediately"?

14   A.    That's correct.

15   Q.    Who determines whether something's a hazard to

16   navigation that requires immediate repair?

17   A.    I made that determination.

18   Q.    And what do you base that on?  Just sort of your

19   sense of having been around these bridges for a long time?

20         MR. FINN:  Objection.

21         Go ahead.

22   A.    Yes.

23   Q.    (By Mr. Zonghetti)  If a piece of the bridge is

24   hanging off into this waterway, this narrow span between

# EXHIBIT D

December 2, 2000 Allision

| Item No. | Quantity | Repair Item | Unit Price | | Amount | |
|---|---|---|---|---|---|---|
| | | | Dollars | Cents | Dollars | Cents |
| 1 | 22 | Electrical Work<br>Bent Units | $ 666 | .67 | $ 14,666 | .74 |
| 2 | 9 | Removal of Welds<br>Bent Units | $ 500 | .00 | $ 4,500 | .00 |
| 3A | 48 | Demolition of Damaged Fender Components<br>Bent x Level Units | $ 533 | .33 | $ 25,599 | .84 |
| 3B | 9 | Remove, Store, and Reconnect Structural Steel Bracing<br>Bent Units | $ 4,700 | .00 | $ 42,300 | .00 |
| 4 | 53.22% | Mobilization<br>Percentage Basis = Proportion of Repair Items Attributable to This Incident | $ 25,000 | .00 | $ 13,305 | .00 |
| 5 | 36 | Polyethylene Fender Face<br>Linear Feet | $ 196 | .00 | $ 7,056 | .00 |
| 6A | 1.8 | Treated Timber<br>Thousand Feet Board Measure | $ 5,300 | .00 | $ 9,540 | .00 |
| 6B | 36 | Removal of Existing Timber Waler<br>Bent Units | $ 62 | .40 | $ 2,246 | .40 |
| 6C | 36 | Storage and Reset of Existing Timber Waler:<br>Bent Units | $ 91 | .20 | $ 3,283 | .20 |
| 6D | 0 | Disposal of Unsuitable Existing Timber Waler:<br>Bent Units | $ 24 | .00 | $ 0 | .00 |
| 6E | 0 | Provide and Install New Timber Waler<br>Bent Units | $ 127 | .20 | $ 0 | .00 |

1

December 2, 2000 Allision (Continued)

| Item No. | Quantity | Repair Item | Unit Price | | Amount | |
|---|---|---|---|---|---|---|
| | | | Dollars | Cents | Dollars | Cents |
| 7 | 53 | Structural Steel<br><br>Bent Units | $ 3,310 | .34 | $ 175,448 | .02 |
| 8A | 0 | Miscellaneous Dolphin Repairs<br><br>Bent Units | $ 1,666 | .67 | $ 0 | .00 |
| 8B | 53.22% | Crane, Barge, and Crew<br><br>Percentage Basis = Proportion of Repair Items Attributable to This Incident | $ 390,000 | .00 | $ 207,558 | .00 |
| 8C | 53.22% | Tugboat<br><br>Percentage Basis = Proportion of Repair Items Attributable to This Incident | $ 120,000 | .00 | $ 63,864 | .00 |
| 9A | 1/6 | Safety Controls<br><br>1/6 of Total | $ 9,500 | .00 | $ 1,583 | .33 |
| 9B | 69.23% | Safety Signs<br><br>Percentage Basis = Proportion of Roadway Closure Expenses (for Chelsea Side Only) Attributable to This Incident | $ 7,236 | .00 | $ 5,009 | .48 |
| 9C | 69.23% | Portable Barricades<br><br>Percentage Basis = Proportion of Roadway Closure Expenses (for Chelsea Side Only) Attributable to This Incident | $ 3,550 | .00 | $ 2,457 | .67 |
| 9D | 69.23% | Median Barrier<br><br>Percentage Basis = Proportion of Roadway Closure Expenses (for Chelsea Side Only) Attributable to This Incident | $ 2,000 | .00 | $ 1,384 | .60 |
| 9E | 69.23% | Portable Signs<br><br>Percentage Basis = Proportion of Roadway Closure Expenses (for Chelsea Side Only) Attributable to This Incident | $ 4,400 | .00 | $ 3,046 | .12 |
| 9F | 69.23% | Traffic Officer<br><br>Percentage Basis = Proportion of Roadway Closure Expenses (for Chelsea Side Only) Attributable to This Incident | $ 40,000 | .00 | $ 27,692 | .00 |
| 10 | 69.23% | Field Office<br><br>Percentage Basis = Proportion of Roadway Closure Expenses (for Chelsea Side Only) Attributable to This Incident | $ 4,000 | .00 | $ 2,769 | .20 |

December 2, 2000 Allision (Continued)

| Item No. | Quantity | Repair Item | Unit Price | | Amount | |
|---|---|---|---|---|---|---|
| | | | Dollars | Cents | Dollars | Cents |
| City Resident Engineer | 53.22% | Percentage Basis = Proportion of Repair Items Attributable to This Incident | $ 88,800 | .00 | $ 47,259 | .36 |
| Other Engineers & Administrator | 53.22% | Percentage Basis = Proportion of Repair Items Attributable to This Incident | $ 31,200 | .00 | $ 16,604 | .64 |
| SUBTOTAL | | | | | $ 677,173 | .60 |
| City Design Engineering Cost. 12% | 53.22% | Percentage Basis = Proportion of Repair Items Attributable to This Incident | $ 136,242 | .91 | $ 72,507 | .99 |
| Previous Repairs and Adjustments | | | | | | |
| TOTAL | | | | | $ 749,681 | .59 |

# Exhibit E

01/04/01  THU 11:53 FAX 6174513423          VOLLMER ASSOCIATES                    ☑001

```
*********************************
***   ERROR TX REPORT   ***
*********************************


TX FUNCTION WAS NOT COMPLETED

TX/RX NO              2810
CONNECTION TEL        345608
SUBADDRESS
CONNECTION ID         BSC GROUP
ST. TIME              01/04 11:53
USAGE T               00'00
PGS.                  0
RESULT                NG

                                     0        #018
```

Ph. -4300
Fax 896-4301



**VOLLMER ASSOCIATES** LLP
ENGINEERS · LANDSCAPE ARCHITECTS · PLANNERS

## FACSIMILE COVER PAGE

NUMBER OF PAGES (Including Cover): 6

TO: Will Noonan

COMPANY: BSC Group

FAX NO: _____

☑ The original of this facsimile will be sent by: ☑ ordinary mail, ☐ messenger, ☐ overnight.
☐ This will be the only form of delivery of this document.

FROM: Mike McCall / John Grieco

PROJECT: 2000-223 Boston Bridge Overview

DATE / JOB NO.: 1-4-01

PLEASE ADVISE BY PHONE 617-451-0044 OR FAX 617-451-5123
IF ANY PAGES ARE NOT RECEIVED

OTHER COMMENTS: See attached Scope of Work
and Manhour Estimate for inspection and
design work for repairs to Chelsea St.
Bridge fender + dolphin system (for
damage done by Dec. 2 and Dec. 8, 2000

## ROUGH ESTIMATE FOR PROJECT INITIATION PURPOSES

| ITEM # | DESCRIPTION | VA 1/4/01 EST. TOTAL QUANT. | VA UNIT PRICE | VA COST |
|---|---|---|---|---|
| 106.51 | ELEC BRI. B-16-20 L.S. | 1 | $ 7,000.00 | $ 7,000.00 |
| 108.422 | REM. WELDS LIN FT | 25 | $ 75.00 | $ 1,875.00 |
| 112.1 | DEM.EX.FEN. B-16-20 L.S. | 1 | $ 10,000.00 | $ 10,000.00 |
| 195.1 | VERI EX UTILITYS B-16-20 L.S. | 1 | $ 2,000.00 | $ 2,000.00 |
| 743 | ENG. FIELD OFF. PER MON. | 3 | $ 2,000.00 | $ 6,000.00 |
| 851 | SAFETY CONT CON OPER. L.S. | 1 | $ 20,000.00 | $ 20,000.00 |
| 852 | SAFETY SIGNS PER SQ FT | 328 | $ 15.00 | $ 4,920.00 |
| 853.1 | PORT. BARRICADES PER EACH | 7 | $ 150.00 | $ 1,050.00 |
| 853.2 | CONC.MED. BARRIERS PERL/F | 0 | $ 25.00 | $ - |
| 856.12 | PORT MESSAGE SIGN P.U.D | 50 | $ 20.00 | $ 1,000.00 |
| 879.001 | CHELSEA POLICE PER HOUR | 100 | $ 26.00 | $ 2,600.00 |
| 879.003 | CHELSEA POLICE SUN. PER HOUR | 50 | $ 39.00 | $ 1,950.00 |
| 955 | TREATED TIMBER PER M.B.M. | 1 | $ 4,750.00 | $ 4,750.00 |
| 955.11 | REM EXIT TIMB WALER PER MBM | 0.25 | $ 2,400.00 | $ 600.00 |
| 955.12 | ST/RESET EXIS TIMB WAL P M B M | 0.25 | $ 3,500.00 | $ 875.00 |
| 955.13 | DIS EXI TIMB WALER PER MBM | 0.25 | $ 500.00 | $ 125.00 |
| 955.14 | INSTALL NEW WALER PER MBM | 0.25 | $ 3,300.00 | $ 825.00 |
| 960 | STRUC STEEL PER POUND | 15000 | $ 4.00 | $ 60,000.00 |
| 999.145 | MISC DOLPHIN REP. L.S. | 1 | $ 10,000.00 | $ 10,000.00 |
| | | | | |
| | LOW TOTAL | | | $ 135,570.00 |
| | "McArdle" Factor | | | 1.4 |
| | PROBABLE TOTAL | | | $ 189,798.00 |
| | "We don't want to be low" Factor | | | 1.5 |
| | HIGH TOTAL | | | $ 284,697.00 |
| | | | | |
| | | | | |