Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004
(212) 422-6111

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

----------------------------------------------------X

City of Boston,

        Plaintiff,

    -against-

Reinauer Transportation Companies,
LLC,

        Defendant.

----------------------------------------------------X

Civil Action No.:
03-12415 (RWZ)

MEMORANDUM OF LAW OF DEFENDANT
REINAUER TRANSPORTATION COMPANIES, LLC
IN OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE
AND IN SUPPORT OF CROSS MOTION IN LIMINE OF
DEFENDANT REINAUER TRANSPORTATION COMPANIES, LLC

Gino A. Zonghetti
*Of Counsel*

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004
(212) 422-6111

## INTRODUCTION

Plaintiff City of Boston ("City") sues Reinauer Transportation Companies, LLC ("Reinauer") as a result of alleged damage caused by a barge owned and operated by Reinauer when it allided with the Chelsea Street Bridge, owned by plaintiff City. Plaintiff moves seeking an order that the evidentiary presumption set forth in *The Oregon,* 158 U.S. 186 (1895) applies in favor of plaintiff in this law suit. The doctrine articulated in *The Oregon* creates a rebuttable presumption of fault when a vessel strikes a fixed structure. Plaintiff's motion should be denied since the rebuttable presumption articulated in *The Oregon* does not apply given the facts of the instant case. Reinauer cross-moves for an order capping recoverable damages, if any, to the amount for which the alleged damage to the Chelsea Street Bridge could have been repaired at the time of the allision. While Reinauer asserts that plaintiff will be unable to prove entitlement to any damages, for a variety of reasons, the maritime law limits damages to costs of repairs at the time of an accident.

## FACTS

Reinauer is in the marine transportation business and operates tug boats and barges carrying petroleum products along the east coast of the United States. On December 2, 2000, Reinauer's tugboat DACE REINAUER was pushing Reinauer barge RTC 502 on the Chelsea Creek when it allided with the Chelsea Street Bridge allegedly causing damage to its fendering system. Defendant Reinauer challenges both the issues of liability and damage, and has counterclaimed against plaintiff for damage caused its barge in the allision.

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

As plaintiff concedes, in 1992 the United States Coast Guard declared the Chelsea Street Bridge to constitute "an unreasonable obstruction to the free navigation of Chelsea Creek" pursuant to authority set forth in the Trumann Hobbs Act, 33 U.S.C. §§ 511-522. This finding followed an investigation by the Coast Guard which included public hearings, testimony and evidentiary submission. This finding resulted in an "Order to Alter" issued by the United States Coast Guard ordering the bridge to be rebuilt to increase the horizontal distance between the fenders of the bridge so as to accommodate larger vessels necessarily transiting the Chelsea Creek. (A copy of the Coast Guard's findings upon investigation are annexed hereto as Exhibit A). The Order to Alter required the City of Boston to "alter" the bridge by reconstructing it so as to provide "an unobstructed horizontal clearance of no less than 380 feet" – approximately quadrupling the existing horizontal clearance provided of 96 feet. Studies conducted in conjunction with the Coast Guard's investigation under the Truman Hobbs Act revealed that from between 1972 and 1991 there were at least 98 reported allisions between vessels and the bridge (Exhibit A). The Coast Guard determined that allisions occurred with the Chelsea Street Bridge on the order of 1 every 2.1 months – creating "a risk" the Coast Guard determined to be "unacceptable" (Exhibit A, p. 10). Discovery in this case has established that since 1995 there have been at least 18 reported allisions with the bridge.

Admissions by plaintiff in the form of deposition testimony of management level employees of plaintiff produced in response to depositions taken pursuant to Fed.R.Civ. P. 30(b)(6) establishes that the contact between Reinauer's barge and the fendering system of the Chelsea Street Bridge was expected, common place, and required for

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

vessels to transit the Chelsea Creek between the bridge. As a result, defendant submits that it is simply not the type of contact that falls within the underlying principals embodied by the rule set forth in *The Oregon.*

Joseph Casazza, Commissioner of Public Works for the City of Boston, testified that he was aware since approximately 1968 when he first became Commissioner, of problems with vessels navigating through the Chelsea Street Bridge given the narrow opening between its fenders (Exhibit B, p. 9). Mr. Casazza testified that the as a result of its Truman Hobbs Act investigation the Coast Guard "found [the Chelsea Street Bridge] was an unreasonable obstruction for navigation and the City agreed" (Exhibit B, p. 49). Further, Mr. Casazza acknowledged the City was aware it was "very probable" allisions would continue at the Chelsea Street Bridge until the time the City was able to comply with the Coast Guard's Order to Alter by replacing the bridge (Exhibit B, p. 35). He testified that the problem caused by the narrowness of the opening between the bridge was that tugboats could not be used on either side of barges when going through the opening to assist the barges (Exhibit B, p. 11). In addition, Mr. Casazza described the problem as follows:

> As far as the tugboats are concerned, it's my belief … that ideally you could take a certain size vessel, and I'm sure there are some, there are certain vessels where you can have a boat in one corner, a tugboat in one corner, and they can steer it through. But once you get to a certain width and there is no room, the tugboats lose control, if you will, of it going through the slip, and that's where mother nature, wind, everything else, could take over and whoever is captaining it through that slip. I think I know that. (Exhibit B, p. 38).

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

James Burke, former Superintendent of Bridge Operations and Maintenance for the City of Boston testified at his 30(b)(6) deposition in this law suit that it was commonplace for vessels navigating through the span of the Chelsea Street Bridge to come into contact with its fenders (Exhibit C, p. 136). Mr. Burke also testified that it was not uncommon for tugs and tankers to literally rest against Chelsea Street Bridge's fendering system while attempting to pass through (Exhibit C, p. 137). Mr. Burke further conceded as follows:

> "Q.    And that's because even the best navigators, given the tight quarters there, literally need, on occasion, given the tide, the wind and what have you, to rest up against the bridge to make it through?
>
>    Mr. Finn:    Objection. Go ahead.
>
> A.    Correct. (Exhibit C,  p. 137).

Mr. Burke further conceded that "the City does not object" to vessels resting or scraping against the Chelsea Street Bridge's fendering system because the City: "deem[s] that a necessary practice to get through that tight span …" (Exhibit C,  p. 138).   Mr. Burke conceded that the difference between the number of allisions experienced at the Chelsea Street Bridge and the other bridges that he supervised in the City of Boston was on the order of "[t]en to one," with the larger number of allisions occurring at the Chelsea Street Bridge (Exhibit C, p. 142).  When pressed further he explained: "Maybe even more than that. I mean very, very rarely does any other bridge have an incident" (Exhibit C, p. 142).  He admitted that the Chelsea Street Bridge was a "cause of concern" because of its problems with allisions (Exhibit C, p. 142), and that his best estimate was that he personally witnessed at least one scrapping a week of the fendering system of the Chelsea Street Bridge by a vessel while visiting the bridge,

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

on average, three days during each week (Exhibit C, p. 143). According to Mr. Burke, tugs and tankers going through the bridge transported petroleum products and constituted "necessary commercial traffic" (Exhibit C, p. 147). He conceded that the tugs navigated at "dead slow speeds" through the bridge and that was the only way they could go safely through the bridge (Exhibit C, p. 147). Mr. Burke also conceded that it was often difficult to determine whether a particular allision caused damage to the bridge, and that the bridge tenders, who were responsible for reporting alleged damage, were given neither training nor guidelines with respect to determining whether damage had in fact occurred (Exhibit C, p. 145).

Mr. Burke admitted that the purported damage from the incident underlying this law suit of December 2, 2000 did not "render the bridge inoperable for any period of time," and did not create any sort of safety hazard (Exhibit C, p. 151). Mr. Burke testified that consideration of whether to make repairs to the supposed damage caused by the incident of December 2, 2000 included whether it was wise to spend money repairing damage that was likely to recur as a result of the configuration of the bridge. Mr. Casazza testified the Commonwealth of Massachusetts had recently made a decision to fund the replacement of the Chelsea Street Bridge (Exhibit B, p. 18) and that the replacement of the Chelsea Street Bridge, as required by the Coast Guard's 1992 Order to Alter, was "most certainly" to occur in the very near future (Exhibit B, p. 20). Mr. Casazza further testified that plaintiff City was not expected to expected to expend any money in the construction of the new bridge (Exhibit B, p. 22). Mr. Casazza also testified that on behalf of plaintiff City he made the decision not to repair any of the alleged damage caused by the allision underlying this law suit, stating,"[t]here is no

-6-

sense in making whatever the estimate of repairs would have been and then watch it got torn out in a relatively short time frame" (Exhibit B, p. 25).

In August, 2006 plaintiff produced as an alleged repair estimate for the damage supposedly caused by the allision (Exhibit D), which purports that the damage from the allision could be repaired for the sum of $749,681. This estimate is based upon the supposed cost of repairing the damage caused the Chelsea Street Bridge in 2006 for damage that allegedly occurred in 2000. The engineering concern that prepared the initial estimate for damage for the City of Boston, however, presented a drastically different estimate as to alleged cost of repair shortly after the claimed allision of December 2, 2000. Indeed, a "rough estimate" prepared by Vollmer Associates LLP on January 4, 2001, an engineering concerned engaged as a subcontractor by BSC Group, the engineering company that had the direct contract with the City of Boston to provide estimates as to bridge damage repairs, estimated the cost of repair damages supposedly caused in two separate allisions, one being the December 2, 2000 allision and the other occurring on December 8, 2000, to be $135,570 (Exhibit E). Since this estimate included repairs due to two allisions, the estimate for the December 2nd allision repairs was obviously lower than said sum.

## ARGUMENT

### A.    *Applicable Law:*

Federal maritime law applies to the claims of plaintiff in this law suit. Under the Admiralty Extension Act, "[t]he admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." *Canino v. Londres,* 862 F.Supp. 685 (D.N.H.,1994), *quoting* 46 U.S.C.App. § 740. The purpose of the Admiralty Extension Act was to "remedy the anomalous situation that parties aggrieved by injuries done by ships to persons or property ashore (such as bridges, docks, and the like) could not sue in admiralty even though the damage to the ships caused by a land structure was maritime." 1 Steven F. Friedell, *Benedict on Admiralty* § 173, at 11-36; 7A James WM. Moore and Alfred S. Palaez, *Moore's Federal Practice* § . 325[4], at 3580 (2d ed. 1993). The Admiralty Extension Act, therefore, extends admiralty and maritime jurisdiction to situations involving injuries suffered on land which were caused by a vessel on navigable waters. The types of cases covered by the Act include situations where land-based damage or injury results from a vessel striking a bridge or pier, or from a vessel running aground, or as a result of a failure of the vessel's equipment during loading jobs. *Benjamin v. Natural Gas Pipeline Co.,* 793 F. Supp. 729, 731 (S.D.Tex.1992) (citing 1 Steven F. Friedell, *Benedict on Admiralty* § 173).

The *Oregon* rule creates a rebuttable presumption of fault against a moving vessel, which under its own power, allides with a stationary object. 158 U.S. at 192-93, 15 S.Ct. 804. The *Oregon* rule is premised on "the common-sense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way." *Folkstone Maritime, Ltd.,* 64 F.3d at 1050 (quoting *Wardell v. Nat'l Transp. Safety Bd.,* 884 F.2d 510, 512 (9th Cir.1989)).  This presumption merely addresses a party's burden of proof and/or burden of persuasion and is not a rule of ultimate liability.  *Folkstone Maritime, Ltd.,* 64 F.3d at 1050; *City of Chicago v. M/V*

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

*MORGAN,* 375 F.3d 563 (7th Cir. 2004).  Generally, presumptions "are designed to fill a factual vacuum," and if the facts of a case are apparent, the need for a presumption is eviscerated.  *Rodi Yachts, Inc. v. Nat'l Marine, Inc.,* 984 F.2d 880, 887 (7th Cir.1993).

Liability, however, will not arise unless a party's act or omission is a "substantial" and "material" factor in causing the allision.  *American River Trans Co. v. Kavo Kaliakra S.S.,* 148 F.3d 446, 450 (5th Cir.1998).  If, however, the vessel's contact with the stationary object is "expected" or "minor," the presumption is not applied unless that contact rises "above a certain minimal level."  *See American Petrofina Pipeline Co. v. M/V Shoko Maru,* 837 F.2d 1324, 1326 (5th Cir.1988) (recognizing that slight damage to a fender system during "normal docking" may fall outside the purview of the presumption) (collecting cases); *Manufacturers Rys. Co. v. Riverway Harbor Serv. St. Louis,* 646 F.Supp. 796, 798 (E.D.Mo.1986) (same), *City of Chicago v. M/V MORGAN, supra.*  Application of the *Oregon* presumption does not supplant the general negligence determination which requires a plaintiff to prove the elements of duty, breach, causation and injury by a preponderance of the evidence; rather, it merely satisfies the plaintiff's *prima facie* case.  *Bunge Corp.,* 558 F.2d at 798;  *Brown and Root Marine Operators, Inc. v. Zapata Off-Shore Co.,* 377 F.2d 724, 726 (5th Cir.1967).  Once fault is presumed the defendant may come forward with evidence to rebut the presumption, *The Oregon,* 158 U.S. at 192-93, 15 S.Ct. 804, by showing that:  (1) the allision was actually the fault of the stationary object;  (2) the moving vessel acted with reasonable care;  or (3) the allision was the result of an inevitable accident.  *Folkstone Maritime, Ltd.,* 64 F.3d at 1050 (finding *Oregon* presumption rebutted when bridge failed to fully open); *I & M Rail Link, L.L.C. v. Northstar Navigation, Inc.,* 198 F.3d 1012, 1013 (7th Cir.2000) (finding

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

*Oregon* presumption rebutted and remanding for trial when bridge was an unreasonable obstruction to navigation);  *Graves v. Lake Michigan Car Ferry Transp. Co.,* 183 F. 378, 380 (7th Cir.1910).

Rebutting the presumption does not necessarily exonerate the vessel from all liability.   Under the principles of pure comparative fault, both parties may be found to have contributed to the accident. "When two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault." *United States v. Reliable Transfer Co.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); *Brotherhood Shipping Co., Ltd. v. St. Paul Fire & Marine Ins. Co.,* 985 F.2d 323, 325 (7th Cir.1993).   Therefore, under the comparative fault analysis between a vessel and a stationary object, a vessel may minimize its liability by providing evidence that the stationary object contributed to the injury it incurred, however, it will be absolved of liability only if the stationary object is deemed the *sole* proximate cause of the injury.   *Bunge Corp.,* 558 F.2d at 802 (emphasis added).

In *U.S. v. Norfolk –Berkley Bridge Corp.,* 29 F.2d 115 (D.Va. 1928), the issue of the liability of a bridge constituting an obstruction to navigation for damage caused to a vessel plying waters in the vicinity of the bridge was addressed. In *U.S. v. Norfolk – Berkley Bridge Corp.,* the issue in question was whether a bridge over a navigable

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

waterway constructed pursuant to federal authorization could be held liable for damages to vessels.  The court held as follows:

> It is fundamental, as a general proposition of law, that any obstruction to navigation is unlawful, since the public is entitled to the unobstructed use of every part of a navigable river. *Georgetown v. Alexandria Canal Co.,* 12 Pet. 97, 9 L.Ed. 1012; *Clement v. Metropolitan West Side El. Ry. Co.* (C.C.A.) 123 F. 271. Furthermore, the matter is regulated by the Act of Congress of March 3, 1899, 30 Stat. 1151; 33 USCA § 403, which declares that the creation of any obstruction not authorized by Congress to the navigable capacity of any waters of the United States is prohibited. The bridge, having cited the special acts of Congress and the permits of the Secretary of War as justifying its existence, has the burden of proof to show that, in its erection and maintenance, it conformed to the requirements, for grants of this kind against the public right must be strictly construed. *Pa. R. Co. v. Baltimore & New York Ry. Co. (C.C.) 37 F. 129; Thom v. City of South Amboy (D.C.) 236 F. 289; Texarkana & Ft. S. Ry. Co. v. Parsons (C.C.A.) 74 F. 411; Hannibal & St. J.R. Co. v. Missouri River Packet Co.,* 125 U.S. 260, 8 S.Ct. 874, 31 L.Ed. 731. The overwhelming weight of the evidence indicates that the bridge has failed to meet this burden and is subject to the legal consequences of its failure. What they are is set out with precision, for the purposes of this case, in the decisions of the Circuit Court of Appeals for the Fourth Circuit in *The Cromwell,* 259 F. 166; *Savannah & N.Y. Transportation Co. v. Klaren Bridge Co. Co. (C.C.A.) 252 F. 499.* It is there laid down that the official approval by the government of the construction of the bridge is conclusive that the bridge is a lawful structure, although it interferes with navigation, and, if a moving vessel collides with the bridge, there is a presumption of negligence on the part of the vessel, which must approach the bridge with reasonable skill and care to avoid injuring it, having in mind the difficulty and peril occasioned by the bridge itself. **On the other hand, the rule as to a bridge which is an unlawful obstruction to navigation is different. While such a structure may not be injured negligently by a passing vessel with impunity, nevertheless the vessel which strikes it is not presumptively negligent or careless, but the bridge owner is presumptively at fault, unless he can show that the failure to comply with the requirements was not one of the factors or causes which contributed to the injury. The bridge owner is entitled to recover from the ship only if he can show that the failure to comply with the law was in no way responsible for or contributed to the accident or disaster. It will appear hereafter, from the discussion of the details of the navigation of the ships at the time of the respective collisions, that the bridge company has failed in this case to show that the overhang of the fenders did not contribute to bring about the collision. It is therefore unnecessary to**

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

*decide whether or not a stricter rule should be applied, namely that it is incumbent upon the bridge to show that the defects therein could not have caused the collision, in analogy with the rule laid down in Belden v. Chase, 150 U.S. 699, 14 S.Ct. 264, 37 L.Ed. 1218, that when a vessel has committed a positive breach of statute, she must show, not only that probably her fault did not contribute to the disaster, but that it could not have done so.* (Emphasis added).

*See also, City of Boston v. SS TEXACO TEXAS*, 599 F. Supp. 1332 (D.Mass. 1984); *Board of Com'rs of Port of New Orleans v. M/V Agelos Michael*, 390 F.Supp. 1012, 1015 (E.D.La. 1974).

In *William B. Patton Towing Company v. J.J. Spiller, Jr.*, 440 S.W.2d 869 (Tex. 1969), the court relying upon *U.S. v. Norfolk –Berkley Bridge Corp.*, 29 F.2d 115 (D.Va. 1928), determined that defendant pier owner was responsible for damage to plaintiff's vessel. The court held as follows:

> We believe it therefore apparent that if the plaintiff's pier had not protruded into the navigable waters of the river as they did no collision would have occurred.  Stated another way, except for the presence and protrusion of the pier into the river the barges would have cleared.  Under these circumstances it cannot be said that the construction and maintenance of a pier of these dimensions in this location could not have contributed to the collision.  On the contrary, we believe the plaintiff's evidence shows that the pier's size and location was shown to be the only cause of the collision other than the winding nature of the river itself.

In *I&M Rail Link, LLC v. Northstar Nav., Inc.*, 198 F.3d 1012 (7th Cir. 2000) the court reversed an order granting summary judgment to plaintiff bridge owner in an allision case. The district court relied upon the judicially created presumption articulated in *The Oregon*, 158 U.S. 186 (1895) in granting summary judgment. The court reversed holding presumption was inappropriate given the fact that the bridge in question, the Sala Bridge, was determined to be a hazard to navigation under the Truman Hobbs Act 33 U.S.C. §§ 511-23.   The court rejected plaintiff's argument that the Coast Guard's

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004
(212) 422-6111

finding that the bridge constituted an unreasonable obstruction to navigation under the Truman Hobbs Act should be ignored because, purportedly, findings under said Act were made solely to commence a funding process for a new bridge construction. The court wrote in pertinent part as follows:

> All bridges with piers in the water or decks lower than the tallest ship obstruct navigation. Usually the degree of obstruction is reasonable in relation to the commercial benefits of the bridge. Sometimes, however, changes in the nature of water-borne commerce or the conditions of the waterway render unreasonable an obstruction that was justified when built. Congress promised that, when such a change occurs, the United States will bear part of the renovation expense.  But that is not *all* the Act does. Section 512 forbids maintenance of a bridge that has become an unreasonable obstruction, and § 519 imposes civil and criminal penalties on bridge owners that fail to comply with a renovation order.  What is more-and what is more important-the Act supplies funding *only if* a bridge has become an unreasonable obstruction to navigation. [Plaintiff] treats the unreasonable-obstruction finding as a matter of form, a kind of administrative wink and nudge needed to liberate public funds. But we have no reason to think that Congress contemplated fraudulent findings; both the structure of the Act and the evident seriousness with which the Coast Guard takes its task show that public funds are available only if the bridge *really is* an unreasonable obstruction to navigation.

> Perhaps the Truman-Hobbs Act as a whole was a concession to bridge owners, a victory for an interest group, but like most statutory packages it is a complex deal, with some features making life easier for the proponents and other features attaching prices.  See Jerry L. Mashaw, *Greed, Chaos, & Governance: Using Public Choice to Improve Public Law* 81-105 (1997); Daniel A. Farber & Philip P. Frickey, *Law and Public Choice: A Critical Introduction* 88-115 (1991). Here a subsidy comes hand in hand with a finding that the bridge is an unreasonable obstruction to navigation. Such a finding has many consequences; one may be an effect on negligence litigation under the admiralty jurisdiction.

> If the Coast Guard's finding were an unelaborated ukase, it would do [defendant] little good in rebutting *The Oregon*'s presumption.  But the Coast Guard gave several reasons, and these reasons have independent significance for the suit. One is that, when the bridge was built, vessels moving on the river were smaller. A 154-foot channel was ample.  Today, with wider, longer, and heavier vessels, the channel is too narrow. With a smaller vessel, the 154-foot span is adequate even if the pilot makes an error; today only precise navigation allows a transit without incident.  The

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

Coast Guard's report observes that towboats must maneuver near the bridge until wind and current, coupled with the vessel's momentum, permit a transit.  That takes time, which increases the expense of navigation. Sometimes the towboat just can't do the job alone; power must be applied at both ends of the tow to keep the assembly straight.   The Coast Guard added that "approximately 90% of the river pilots use helperboats at this bridge on some occasions." Helperboats, which are small tugboats, are costly and add to the delay in passing the bridge.

The Sabula Bridge is struck repeatedly.   For the 11-year period 1980 through 1990, the bridge was hit at least 63 times.  (Some allisions are not reported, so the Coast Guard views this as a conservative estimate.) There were 27,663 recorded commercial tows during this period, so at least 1 in every 439 transits produced an allision. [Plaintiff] says that this shows that the bridge is safe;  with careful navigation a pilot can transit without incident.   But the Coast Guard drew a different inference:  it concluded that a bridge should have a much lower accident rate. What would one think of a highway bridge struck by one out of every 500 passing cars? Or an airport designed so that one of every 500 landings produced an accident?   What if one of every 439 trains passing over the Sabula Bridge derailed? An accident rate of 1 in 439 is too high for river transportation, the Coast Guard concluded. Doubtless some of these allisions could have been avoided by prudent navigation, but others must be chalked up to the fact that the bridge was designed for navigation in a different era.

* * *

The Sabula Bridge is the third-most-frequently struck on the Mississippi: it was hit at least 204 times from 1972 through 1996;  the two "leaders" were hit 481 and 350 times during this period, and three other bridges were struck at least 100 times during these years.  Other bridges are hit rarely if ever.   It is unlikely that all of these allisions can be attributed solely to pilots'   negligence.   Calling   the   most-frequently-struck   bridges unreasonable hazards to navigation makes a good deal of sense.

If the Coast Guard may find the Sabula Bridge an unreasonable obstruction based on the cost and accident data, then so may the trier of fact in admiralty, where Learned Hand's famous *Carroll Towing* formula for negligence originated. Findings in the Coast Guard's report are more than adequate to overcome *The Oregon*'s presumption.   See *Folkstone Maritime, Ltd. v. CSX Corp.,* 64 F.3d 1037, 1050-51 (7th Cir.1995). Perhaps Jarvis should have reversed the Megan Beesecker's engines rather than attempting to use the Illinois channel;  perhaps he blundered earlier when using the current to line up for the transit;  but perhaps this was one of the allisions that are to be expected given the clash between an 1880 design and the nature of modern traffic on the Mississippi.   See Charles Parrow, *Normal Accidents: Living with High-Risk Technologies*

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

(rev. ed. 1999). The trier of fact must give an answer without resort to presumptions. Although the Coast Guard's findings may well be conclusive for some purposes under *Monongahela Bridge Co. v. United States,* 216 U.S. 177, 30 S.Ct. 356, 54 L.Ed. 435 (1910), the question remains whether the shortcomings of the bridge caused this accident. Because admiralty uses a comparative-fault regime, the possibility that Jarvis and the bridge's design each bear some responsibility cannot be overlooked. The judgment is reversed, and the case is remanded for trial.

**B.      *The Oregon Rule Will Not Apply to the Allision with the Fendering System***

The maritime law recognizes that where a vessel's contact with the stationary object is "expected" or "minor," the presumption recognized in *The Oregon, supra,* is not applied unless that contact rises "above a certain minimal level." *American River Trans Co. v. Kavo Kaliakra S.S.,* 148 F.3d 446, 450 (5th Cir.1998); *City of Chicago v. M/V MORGAN,* 375 F.3d 563 (7th Cir. 2004). In the instant case evidence at trial will establish that the contact between Reinauer barge RTC 502 was certainly expected. Indeed, evidence will establish that allisions, both those chosen to be reported by plaintiff's employees, and those which went unreported, with the bridge were frequent. Between 1971 and 1991 the Coast Guard report 98 Chelsea Street Bridge allisions and determined that the risk posed by the bridge's narrow width between its fenders as "unacceptable." Evidence will establish that in addition to reported allisions, contact between vessels and the fendering system of the bridge was essentially a daily event since necessary in many instances for vessels to safely pass through. The evidence at trial will establish that so common were damaging allisions to the bridge that while the bridge was under repair in 1999 as a result of a major allision occurring in 1995 the

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

bridge suffered damages estimated in excess of $200,000, as a result of unreported, unwitnessed allisions.   Plaintiff's bridge superintendent estimated he witnessed one vessel scraping the Chelsea Street Bridge a week during his tenure. Commissioner Casazza testified that the City was well aware of the problems created by the narrow span between the fenders of the bridge and believed it "probable" that allisions would continue to occur. The City was directed, because of the problems with the bridge's span, to alter the bridge so as to increase the span four-fold in 1992, but as of the date of the December 2, 2000 allision had not done so. In short, the allision underlying this law suit could not be characterized other than as expected. Defendants await proofs at trial as to the extent of the alleged damage to the bridge caused by the allision, which defendants contend is in serious dispute and may well have constituted what would be considered normal or incidental damage from an expected allision. Accordingly, plaintiff's motion seeking an *in limine* ruling should be denied.


C.    **The Rule in *The Oregon* Does Not Apply if the Chelsea Street Bridge Is Determined to Be An Obstruction to Navigation**

In *U.S. v. Norfolk –Berkley Bridge Corp.*, 29 F.2d 115 (D.Va. 1928)[1] the court addressed the issue of whether the rebuttable presumption of negligence applied in a bridge allision case where the bridge was determined to constitute an obstruction to navigation. The court determined that the presumption did not apply, stating:

> On the other hand, the rule as to a bridge which is an unlawful obstruction to navigation is different. While such a structure may not be injured negligently by a passing vessel with impunity,

---

[1] *See also, City of Boston v. SS TEXACO TEXAS*, 599 F. Supp. 1332 (D.Mass. 1984); *Board of Com'rs of Port of New Orleans v. M/V Agelos Michael*, 390 F.Supp. 1012, 1015 (E.D.La. 1974).

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

nevertheless the vessel which strikes it is not presumptively negligent or careless, but the bridge owner is presumptively at fault, unless he can show that the failure to comply with the requirements was not one of the factors or causes which contributed to the injury.

The above law, of course, is consistent with the rationale upon which the decision in *The Oregon* was based. Indeed, common sense dictates that in the ordinary course vessels should not, absent negligence, strike fixed objects. As common-sensical, however, is that fixed objects that constitute unreasonable obstructions to navigation are likely to be struck on occasion even without negligence. In 1992 the United States Coast Guard, following investigation and public hearing, declared the Chelsea Street Bridge to be "an unreasonable obstruction to the free navigation of Chelsea Creek." Defendants submit that evidence at trial, including the Coast Guard's findings and conclusions as set forth in the investigative report issued under the Truman Hobbs Act, will establish not only that the Chelsea Street Bridge constituted an unreasonable obstruction to navigation on the Chelsea Creek, but that the obstruction created by the bridge was a substantial factor in causing the allision. Indeed, not only does the rebuttable presumption created by *The Oregon* not apply since the bridge constituted an obstruction to navigation, a presumption of negligence should be imposed against plaintiff for maintaining the unreasonable obstruction to navigation which caused the allision in question.

**D.    The Coast Guard's Findings under the Truman Hobbs Act May be Considered as Evidence of Negligence on the Part of Plaintiff City**

As is set forth in *I&M Rail Link, LLC v. Northstar Nav., Inc.,* 198 F.3d 1012 (7th Cir. 2000), a finding by the United States Coast Guard under the Truman Hobbs Act

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

that the bridge constitutes an unreasonable obstruction to navigation constitutes evidence that may rebut a presumption of negligence under the doctrine articulated in *The Oregon*. It is respectfully submitted that in *I&M Rail Link, LLC, supra*, the court focused solely upon whether a Truman Hobbs Act finding that the bridge constitutes an unreasonable hazard to navigation, in and of itself, rebutted a presumption under *The Oregon Rule,* but not whether said presumption applies at all when sufficient evidence establishes that a bridge constitutes an unreasonable obstruction to navigation. *U.S. v. Norfolk –Berkley Bridge Corp.*, 29 F.2d 115 (D.Va. 1928). Thus, while defendants assert that no presumption arises in the first instance where a bridge is an unreasonable obstruction to navigation, even if said presumption is applied, it is submitted that at trial in this case the Truman Hobbs Act finding of the Coast Guard will serve to rebut it. *Ibid.*

**D.    *A Presumption of Negligence against Plaintiff Arises under The Pennsylvania Rule***

Plaintiff claims that the Pennsylvania Rule does not apply so as to give rise to a presumption of fault against it. In *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), the Court articulated as follows what has come to be referred to as "*The Pennsylvania* rule": "[w]hen ··· a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probable was not, but that it could not have been." In *United States v. Nassau Marine,* 778 F.2d 1111, 1114, 1116-1117 (5th Cir.1985), the court articulated a test for determining when to apply the

-18-

presumption of the Pennsylvania Rule. That Court held that three elements must exist: (1) proof by a preponderance of the evidence of violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent. *See also Folkstone Maritime v. CSX Corporation,* 64 F.3d 1037, 1047 (7th Cir.1995). *In Union Pacific R. Co. v. Kirby Inland Marine, Inc. of Mississippi,* 296 F.3d 671 (8th Cir. 2002), the Eight Circuit Court of Appeals held that a Truman Hobbs Act finding that a bridge constituted an unreasonable hazard to navigation did not give rise to invocation of the Pennsylvania Rule, which results in a finding of negligence where a party violates a statutory or regulatory rule which causes an accident, unless rebutted. *Ibid.* The Eight Circuit held that the Truman Hobbs Act was not a "safety statute," and further did not "impose a specific duty or prevent a specific sort of injury," and, accordingly, did not provide a basis for imposition of the Pennsylvania Rule with its concomitant presumption. Defendants respectfully assert, however, that the Eight Circuit's decision in *Union Pacific, supra,* was incorrectly decided and that the Seventh Circuit's decision in *I&M Rail Link, LLC v. Northstar Nav., Inc, supra,* provides a basis for application of the Pennsylvania Rule to the City in this case.

As set forth above, in *I&M Rail Link, LLC v. Northstar Nav., Inc,* the issue addressed was whether a finding of negligence under the Truman Hobbs Act rebutted a presumption of fault under the rule of *The Oregon.* Plaintiff argued that it could not, claiming that a Truman Hobbs Act finding constituted nothing more than a trigger for federal funding for a replacement bridge. The Seventh Circuit, while acknowledging that

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

a Truman Hobbs Act finding leads to some federal funding of a replacement bridge, held "[b]ut that is not *all* the Act does. Section 512 forbids maintenance of a bridge that has become an unreasonable obstruction, and § 519 imposes civil and criminal penalties on bridge owners that fail to comply with a renovation order." 198 F.3d at 1015. The court further held that the government subsidy comes "hand in hand with a finding that the bridge is an unreasonable obstruction to navigation" and that such a finding "has many consequences; one may be an effect on negligence litigation under the admiralty jurisdiction."   The court, however, was not asked to address whether continued maintenance of a bridge in violation of the Truman Hobbs Act provided a basis for imposition of the Pennsylvania Rule.

Defendant submits that the Pennsylvania Rule should apply as a result of plaintiff's violation of 33 U.S.C. § 512, which states: "No bridge shall at any time unreasonably obstruct the free navigation of any navigable waters of the United States." The Coast Guard specifically determined that this federal statute was violated by declaring the Chelsea Street Bridge to constitute an unreasonable obstruction to navigation and by issuing its Order to Alter. Most respectfully, the Eight Circuit's rationale in Union Pacific  for refusing to find the Pennsylvania Rule applied to a bridge determined to constitute an unreasonable obstruction to navigation in violation of 33 U.S.C. § 512 is infirm and should not be relied upon by this Court. The Pennsylvania Rule has routinely been applied in instances where a party has acted in violation of a statute, order or ordinance so as to create or cause an obstruction to navigation that resulted in an accident. For example, in *Pelican Marine Carriers, Inc. v. City of Tampa,* 791 F.Supp. 845 (M.D.Fla.,1992) it was determined that the Pennsylvania Rule was

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

violated by defendant City of Tampa where it failed to comply with a permit issued by the Army Corps of Engineers with respect to an underwater sewer line that was hit by plaintiff's vessel. The court held that failure to comply with permit terms constituted a Pennsylvania Rule violation, as did the creating of an obstruction to navigation in violation of 33 U.S.C. § 403. *See also, e.g., Orange Beach Water, Sewer, and Fire Protection Authority v. M/V Alva*, 680 F.2d 1374 (11th Cir. 1982); *Turecamo Maritime, Inc. v. Weeks Dredge No. 516,* 872 F.Supp. 1215 (S.D.N.Y. 1994).

As noted in *I&M Rail Link, LLC v. Northstar Nav., Inc, supra,* one of the many consequences of a finding under the Truman Hobbs Act that a bridge is an unreasonable obstruction of navigation is the effect such finding may have on issues of negligence in litigation. Without question the fact that the Chelsea Street Bridge was the subject of numerous allisions played a significant role in the Coast Guard's Truman Hobbs' finding. As noted further in *I&M Rail Link, LLC, supra,* the Coast Guard may only issue an order to alter after finding that the obstruction to navigation is unreasonable. It follows that 33 U.S.C. § 512, as well as the Coast Guard's findings thereunder, involve marine safety and/or navigation and that the injury suffered, i.e. an allision with damage, was at least one of the consequences said statute and findings of the Coast Guard thereunder was designed to prevent. *United States v. Nassau Marine,* 778 F.2d 1111, 1114, 1116-1117 (5th Cir.1985). Defendants submit that the Pennsylvania Rule should be found to apply as against plaintiff City of Boston.

Plaintiff makes a vague argument that Reinauer may have violated some unspecified navigation rules, and that this may somehow give rise to a Pennsylvania Rule violation against Reinauer. It is obviously difficult to respond to such argument,

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

since non-specific, but obviously no finding of a Pennsylvania Rule violation can be premised upon unspecified rules that may, or may not, have been violated.

**E.    *Reinauer's Cross Motion that Damages Must Be Capped at the Cost of Repairs At the Time of the Allision Must be Granted.***

Defendants submit that plaintiff will be unable to sufficiently prove that any damage to the Chelsea Street Bridge was caused by Reinauer since plaintiff appears unable to establish the condition of the bridge prior to the alleged allision and there are indications that it was not in good repair. Further, plaintiffs have not, and will not repair the damage supposedly caused the bridge's fendering system but will replace the entire bridge. Accordingly, defendants intend to argue that despite the established maritime law concept that an owner need not repair damage in order to recover damages, this case represents facts so unique that any award of damage to plaintiff would constitute an unwarranted windfall to plaintiff, which is not recoverable, particularly under the equitable powers with which admiralty courts are vested. Indeed, courts in admiralty are authorized to grant equitable relief, including with respect to the type and quantum of damages awarded. *Weeks Marine, Inc. v. Picone, Inc.,* 1998 WL 717615 (S.D.N.Y. 1998)[2]. Damages that will result in an unjustified windfall to a party will be disallowed.

---

[2] A federal court sitting in admiralty is not tied to any strict rules of the common law, but has the authority to make equitable decisions, considering all of the facts and circumstances of the individual case. BP Exploration & Oil, Inc. v. Moran Mid-Atlantic Corp, 147 F.Supp.2d 333 (D.N.J. 2001); *See, e.g., Standard Oil Co. v. S. Pac. Co.,* 268 U.S. 146, 156, 45 S.Ct. 465, 69 L.Ed. 890 (1925) ("It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts."); *The Atlas,* 93 U.S. 302, 312, 23 L.Ed. 863 (1876) ("Disasters of the kind occur from different causes and under very different circumstances, and the rules of admiralty law applicable in the determination of such controversies vary to meet the varying circumstances which give rise to the accident." ); *Pizani v. M/V COTTON BLOSSOM,* 669 F.2d 1084, 1089 (5th Cir.1982) (finding that a federal court sitting in admiralty has equitable powers, thus the common law was not controlling); *Gateway W. Ry. Co. v. Am. River Transp. Co.,* 887 F.Supp. 201, 202 (C.D.Ill.1995) ( "[A] court sitting in admiralty is privileged to exercise flexibility and award what is fair" (quotations and citations omitted); "A

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

*Ibid.* Courts in admiralty are authorized to grant equitable relief, including with respect to the type and quantum of damages awarded. *Weeks Marine, Inc. v. Picone, Inc.*, 1998 WL 717615 (S.D.N.Y. 1998). Damages that will result in an unjustified windfall to a party will be disallowed. *Ibid.* The standard measure of damages for property damage is diminution in value of the property as a result of the accident. *Massachusetts Port Authority v. Sciabba Construction Corp.*, 54 Mass.App.Ct. 509 (2002). Where diminution of value may not properly value the damage, courts may consider other evidence, such as repair or replacement cost. *Ibid.* However, where such measure of damages is considered:

> "care must be taken, if possible, not to permit the injured party to recover more than is fair to restore him to his position prior to his loss. He should not recover a windfall. We are well aware of the danger that evidence of repair or replacement costs 'may lead to an excessive award unless [they are] ⋯ *adequately* discounted for obsolescence and inadequacy as well as for physical depreciation' (emphasis in original). *Ibid*; *Commonwealth v. Massachusetts Turnpike Authy.*, 353 Mass. 143, 148 (1967).

Despite its firm believe that plaintiff will be unable to adequately prove damages, defendants nevertheless cross-move *in limine* for an order capping any recoverable damages to the amount for which the alleged damages caused by the allision could have been repaired at the time of the allision. Defendants submit that entry of such an order by the Court will serve to focus the issues for trial and may well substantially reduce what appears to be a burdensome and irrelevant presentation by plaintiff, as is seemingly presently contemplated.

Under the maritime law where a marine structure is damaged and repairs are not

---

court of admiralty is, as to all matters falling within its jurisdiction, a court of equity. Its hands are not tied up by the rigid and technical rules of the common law, but it administers justice upon the large and liberal principles of courts which exercise general equity jurisdiction." (quotations and citations omitted)).

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

made, damages "can be measured either by estimated costs of repairs at the time immediately following the accident … or by the diminution in the mark value" of the structure. Gilmore & Black, *The Law of Admiralty*, 2d Ed. at 527; *United States v. Shipowners & Merchants Tugboat Co.*, 103 F.Supp. 152, 153 (N.D.Ca. 1952), aff'd 205 F.2d 352 (9th Cir. 1953), *cert. denied* 346 U.S. 829 (1953); *Demetrius Maritime Company, Ltd. v. S.T. CONNECTICUT,* 463 F.Supp. 1108, 1110 fn. 3 (S.D.N.Y. 1979) ("[i]n addition, where, as in the instant case, a ship is damaged but the owner does not effect repairs, the proper measure of recovery is the estimated cost of repairs at a time immediately following the accident"); *Kansas City Southern Railway Company v. BARGE HBC 8106*, 642 F.Supp. 609, 612 (W.D.La. 1986)**;** *Bunge Corp. v. American Commercial Barge Line Co.*, 630 F.2d 1236, 1241 (7th Cir. 1980). *Independent Bulk Transport, Inc. v. Vessel Morania Abaco*, 676 F.2d 23, 26 (2nd Cir. 1982); *Yarmouth Sea Products Ltd. v. Scully,* 131 F.3d 389, 399 (4th Cir. 1997); *Stevens v. F/V Bonnie Doon*, 731 F.2d 1433, 1436 (9th Cir. 1984). There is no question but that recoverable damages as a result of an allision are limited to estimated costs of repairs at the time immediately following the accident.

It is respectfully urged that the court's attention to this issue *in limine* is required since plaintiff, to date, has submitted various and contradictory estimates of the supposed costs of repairs and appears intent attempting to prove its alleged damages based upon repair estimates to repair damages significantly after the time of the allision. For example, plaintiff, in August, 2006, produced as an alleged repair estimate for the damage supposedly caused by the allision Exhibit D, which purports that the damage from the allision could be repaired for the sum of $749,681. This estimate is based upon

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

the supposed cost of repairing the damage caused the Chelsea Street Bridge in 2006 for damage that allegedly occurred in 2000. The engineering concern that prepared the initial estimate for damage for the City of Boston, however, presented a drastically different estimate as to alleged cost of repair shortly after the claimed allision of December 2, 2000. Indeed, a "rough estimate" prepared by Vollmer Associates LLP on January 4, 2001, an engineering concerned engaged as a subcontractor by BSC Group, the engineering company that had the direct contract with the City of Boston to provide estimates as to bridge damage repairs, estimated the cost of repair damages supposedly caused in two separate allisions, one being the December 2, 2000 allision and the other occurring on December 8, 2000, to be $135,570 (Exhibit E). Since this estimate, which was the most contemporaneously made estimate to the December 2, 2000 allision, included repairs due to two allisions, the estimate for the December 2nd allision repairs was obviously lower than said sum.

It is obvious that plaintiff's estimates are grossly disproportionate and it is respectfully submitted that the 2006 estimate is irrelevant to the issues of this law suit since the applicable law limits possible recoverable damages to the amount for which damages could have been repaired "… at the time immediately following the accident …". Entry of an order capping recoverable damages to that amount will effectively serve to appropriately focus issues and evidence in this case and it is respectfully requested that such an order be entered.

## CONCLUSION

Plaintiff's motion *in limine* should be denied and defendant's cross motion *in limine* should be granted.

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004

Dated: November 13, 2006

Kenny, Stearns & Zonghetti
Attorneys for Defendant
Reinauer Transportation Companies

By: _Gino A. Zonghetti_

Gino A. Zonghetti
(BBO # 663120)

To:     John J. Finn, Esq.
        Finn & Finn
        34 Chamberlain Street
        Hopkinton, MA 01748
        (508) 497-5019

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004