Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004
(212) 422-6111
Attorneys for Defendant
Reinauer Transporation Companies, LLC

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-----------------------------------------------------X

City of Boston,

      Plaintiff,

    -against-

Reinauer Transportation Companies,
LLC,

      Defendant.

-----------------------------------------------------X

Civil Action No.:
03-12415 (RWZ)

**Defendant's Trial Memorandum
With Proposed Findings of Fact and
Conclusions of Law**

Defendant Reinauer Transportation Companies, LLC, by its attorneys, Kenny, Stearns & Zonghetti, as and for its Trial Memorandum containing proposed Findings of Fact and Conclusions of Law states as follows:

## INTRODUCTION

This law suit involves plaintiff City of Boston's claim for damages in the approximate amount of $750,000 purporting to represent the cost of repairing damages allegedly caused by a tug boat and barge operated by defendant Reinauer Transportation Companies, LLC on December 2, 2000 when the barge, RTC 502, struck or "allided" with the Chelsea Street Bridge. Reinauer submits that it may not be held liable for the allision since the Chelsea Street Bridge was declared by the United States Coast Guard in 1992 following an investigation undertaken pursuant to the

Truman Hobbs Act, 22 U.S.C. §§ 511 – 524 to constituted an "unreasonable obstruction" to free navigation on the Chelsea Creek because the horizontal span between the fenders of the bridge (96 feet) was determined to be too narrow for prevailing commercial traffic to transit safely. At the time the Coast Guard issued an "Order to Alter," requiring the City of Boston expand the horizontal span of the bridge to no less than 380 feet so as to safely accommodate commercial traffic in the Chelsea Creek, primarily consisting of tankers, tug boats and barges. This order, however, was not complied with by the City of Boston as of the date of the allision. Not surprisingly, the Chelsea Street Bridge has been the site of numerous allisions, and contact with the bridge has become a standard operating procedure by vessels attempting to pass through its span to deliver necessary petroleum products to the terminals north of the bridge. Reinauer submits that the allision on December 2, 2000 was caused by the obstruction to navigation imposed by the Chelsea Street Bridge and not due to actionable fault on its part.

In addition, Reinauer submits that plaintiff City of Boston has not suffered compensable damages as result of the allision and to the extent compensable damages occurred, the sum is significantly less than that claimed by the City. The City of Boston chose not to repair alleged damages caused by the allision of December 2, 2000 because the Commonwealth of Massachusetts has pledged to the City funding to raze the Chelsea Street Bridge and re-build a bridge that complies with the requirements of the Coast Guard's 1992 Order to Alter. The re-building of the bridge, as noted above, is long overdue. The City determined that the damages allegedly caused by the December 2, 2000 allision did not affect the operability of the bridge, its safety or structural integrity

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004
(212) 422-6111

and that no repairs were required. Accordingly, the City of Boston has not, and will never, spend a cent to repair any of the alleged damages. Further, the City of Boston is unable to establish that the damages allegedly caused on December 2, 2000 diminished the value of the Chelsea Street Bridge to any extent. Finally, the repair estimates prepared by the City of Boston regarding the alleged damage have ranged from about $100,000 to $750,000 and have changed since early 2001 so drastically as to not represent credible statements of damages. Reinauer will establish at trial that the damages it allegedly caused could have been prepared for the sum of $75,000 at the time of the allision.

In short, defendant Reinauer Transportation Companies contests liability and damages. The Court is respectfully referred to the Pre-Trial Order submitted by the parties and the within Proposed Findings of Fact and Conclusions of Law for a more detailed statement of the position of defendant.

## PROPOSED FINDINGS OF FACT

1.     The City of Boston is now, and was on December 2, 2000, the owner of the Chelsea Street Bridge (the "Bridge"), a single leaf bascule bridge that spans the Chelsea River and connects East Boston and Chelsea, Massachusetts (Stipulated Facts).

2.     The Bridge has a fendering system consisting of steel piles, wooden timers, dolphins, and other structural components (Stipulated Facts).

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004
(212) 422-6111

3

3.    The fendering system is located in the river on either side of the channel used by vessels moving between Boston Harbor and petroleum product facilities located up the river in Revere (Stipulated Facts).

4.    The Bridge permits over the road vehicular traffic to pass between East Boston and Chelsea (Stipulated Facts).

5.    When a vessel proceeds upstream toward Revere or downstream toward Boston Harbor, the single span of the Bridge is raised and the vessel proceeds through the draw between the draw (Stipulated Facts).

6.    The horizontal clearance between the faces of the fendering system is 96 feet (Stipulated Facts).

7.    One purpose of the fendering system is to protect the structural elements of the bridge from damage by passing vessels (Stipulated Facts).

8.    In 1992 the United States Coast Guard concluded an investigation it had undertaken of the Chelsea Street Bridge under the Truman Hobbs Act, 33 U.S.C. 33 U.S.C. §§ 511 – 524 and issued a final case report setting forth its findings (Trial Exhibit 22). In pertinent part, the Coast Guard found that the Chelsea Creek "is almost exclusively used for the transport of petroleum products by oil tankers assisted by tugs and tug/barge combinations" (Exhibit 24, Final Case Report, page 8). Also found by the Coast Guard was that between 1972 and 1991, 98 vessel allisions were documented, with one in December, 1991 resulting in serious injury to a crew member of a tug boat (Ibid.). In the "Decision Analysis" section of its report under the Truman Hobbs Act the Coast Guard stated that "[t]he restrictive horizontal clearance makes navigation difficult and dangerous …" (Trial Exhibit 24, Enclosure 5, p.2, ¶ d). Importantly, the Coast Guard

found that contact with the fendering system by barges under the tow of a tug appeared to constitute "standard operating procedure" for transiting the bridge, finding the following:

> "Observation by Marica Edwards, Chief, Alterations, Drawbridges and Systems Branch, USCG Headquarters, and information submitted by various waterway users indicated that a vessel pilot must drop speed in order to transit the bridge safety. A tug with an oceangoing barge was observed hitting the fender and bouncing to the center of the navigation opening in order to avoid striking the opposite fender. It appeared to be standard operating procedure as the fender that was struck was already in poor condition and the fender on the opposite side of the navigation channel had been newly replaced" (Trial Exhibit 24, Enclosure 5, p. 2, ¶ c).

The Coast Guard additionally determined that the narrow span between the fendering system of the bridge was too risky to permit to continue, concluding as follows in the final case report issued under the Truman Hobbs Act:

> "A period of 20 years (1972 to 1991) was chosen as a statistically valid time period for the Chelsea Street Bridge (CSB). During this time period a total of 98 vessels allisions have been documented … Capt. Abrams, U.S. Coast Guard Marine Safety Office – Boston stated at the public hearing – "even taking into consideration the navigation restrictions we have imposed, obviously for the sake of safety and to avoid allisions … we still had 36 allisions with the bridge, … since the time of restrictions going into place … that comes out to one incident every 2.1 months. It's not an acceptable risk." (Trial Exhibit 24, p. 10).

9.    The City of Boston participated in the Coast Guard's investigation under the Truman Hobbs Act. On or about November 19, 1991 plaintniff, the City of Boston, in conjunction with the Coast Guard's Truman Hobbs Act investigation, through its Commissioner of Public Works, Joseph Casazza, in a submission to the Coast Guard with the purpose of fostering a finding that the Chelsea Street Bridge constituted an unreasonable obstruction to navigation requiring replacement, conceeded the

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004
(212) 422-6111

inevitabilty of continued allisions between vessels and the Chelsea Street Bridge due to its narrow span by writing to the Coast Guard "[i] is inevitable that a tanker with a ninety foot span, needling its way thorugh a ninety-six foot channel opening will have a collision" (Trial Exhibit 24, Enclosure 1, Appendix A).

10.     As a result of its investigation the United States Coast Guard issued an Order to Alter dated November 23, 1992 pursuant to authority under the Truman-Hobbs Act, 33 U.S.C. Sections 511 – 522 (Trial Exhibit 14).

11.     The Order to Alter states that the Bridge was found to be an unreasonable obstruction to navigation and requires the City to alter the Bridge to provide greater vertical and horizontal clearance for transiting vessels (Trial Exhibit 14). The order required the City of Boston to expand the horizontal span of the Chelsea Street Bridge to provide for a clearance of no less than 380 feet. Accordingly, the order to alter ordered the City of Boston to increase the horizontal span of that Bridge more than four fold (Exhibit 14).

12.     On November 2, 1992 the City of Boston wrote to the United States Coast Guard that it took "no exception to the unreasonable obstruction determination regarding the Chelsea Street Bridge" (Trial Exhibit 25). Further, the City took no action to appeal the finding.

13.     The City of Boston, however, has not complied with the Order to Alter as of present date. The Bridge has not yet been altered or replaced (Stipulated Facts).

14.     Funding through the Commonwealth of Massachusetts has recently been committed for the purpose razing the existing Chelsea Street Bridge and re-building a bridge in its place that would comply with the Coast Guard's 1992 Order to Alter. The

City of Boston believes that construction of the new bridge will begin in the near future. The City of Boston will not expend funds to raze the existing bridge or build the new one. Instead, funding for the project will be provided entirely by the Commonwealth.

15.    Between 1995 and present date there have been at least 17 reported allisions with the Chelsea Street Bridge.

16.    According to the Bridge Superintendent for the City of Boston, James Burke, it has been usual for vessels to scrap against the fendering system of the Chelsea Street bridge when going through the channel between spans of the bridge. In fact, according to Mr. Burke, given the narrow with of the bridge, it was not unusual for vessels going through the bridge to be required to actually rest up against the fenders of the bridge in order to make it through. As per Mr. Burke, the City of Boston did not object to this practice since it recognized that it was a necessary practice to safely get through the tight span of the bridge.

17.    Further, Mr. Burke has conceded that the difference with respect to other bridges owned and operated by the City of Boston and the Chelsea Street Bridge, with respect to the number of allisions occurring, was approximately "10-1" with the vastly greater number occurring at the Chelsea Street Bridge; according to Burke this ratio might be further skewed as he has testified: "Maybe even more than that. I mean, very, very, rarely does any other bridge have an incident." Mr. Burke testified that in numerous years serving as Bridge Superintendent he observed on average one vessel a week scrap the Chelsea Street Bridge. Mr. Burke conceded that there were occasions where vessels would strike the Chelsea Street Bridge where damage was not visible to the naked eye.

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004
(212) 422-6111

18. Accordingly, since contact between vessels and the fendering system of the Chelsea Street Bridge was so commonplace, many instances of contact between vessels and the Chelsea Street Bridge go unreported and un-investigated. At no time applicable to this law suit did the City of Boston have any procedure in place governing the circumstances in which its employees, specifically its bridge tenders, were required to document and/or report instances of contact between vessels and the Chelsea Street Bridge. The reporting of such contact was left to the discretion of the particular bridge tender on duty, who had on training in determining whether damage occurred. In addition, where no "visible damage" occurred as a result of contact between a vessel and the Chelsea Street Bridge no investigation or survey of potential damage was undertaken by the City of Boston.

19. On December 2, 2000, at approximately 5:48 p.m., the tank barge RTC502, controlled by the tug DACE REINAUER and assisted by the tug HERCULES, were proceeding upstream.

20. The tank barge and the tug DACE REINAUER are owned and operated by defendant Reinauer.

21. The tug HERCULES was operated by Reinauer's wholly owned subsidiary, Boston Towing and Transportation Company.

22. Tank barge RTC 502 is 78 feet wide.

23. The tug and barge were manned with a full compliment of duly licensed and trained crew including a captain on duty navigating the tug. The captain positioned a deckhand on the barge for the purpose of assisting with navigational distances through the tight span of the bridge.

24.    The starboard bow of the tank barge made contact with the fendering system beneath the Chelsea Street Bridge on the East Boston side. After this contact was made the barge glanced off the fendering system and its port bow of the barge contacted the Chelsea side of the fendering system.

25.    The tug and barge were navigated with due care through the bridge. Contact between barges and the bridge's fendering system is not unusual and a certain amount of contact is, in fact, quite normal with respect to the Chelsea Street Bridge. Plaintiff, aside from submitting evidence that contact with the bridge occurred, has failed to submit any evidence of negligence or fault on the part of defendant with respect to the damage claimed. Further, the fendering system of the Chelsea Street Bridge, despite the fact that the Chelsea Creek in the area of the bridge is almost exclusively plied by tanker, tug boat and barge traffic, is not designed to protect against contact by light barges.

26.    Although claiming that the Chelsea Street Bridge suffered damages in the allision, the City has not repaired the damage to the fendering system occurring in this allision (Stipulated Facts).

27.    The reason that the City of Boston has not repaired the damage allegedly caused by the allision of December 2, 2000 was because it determined the damage did not affect the operability of the Chelsea Street Bridge or impact upon any issues of safety. Further, given the fact that the bridge is to be razed, and re-built in the very near future utilizing funds provided entirely by the Commonwealth of Massachusetts, the City of Boston determined it would not expend of funds to repair the Chelsea Street Bridge. As conceded by the City of Boston's Public Work's Commissioner, Joseph Casazza, he

made the decision not to repair any of the alleged damage caused by the allision underlying this law suit, stating,"[t]here is no sense in making whatever the estimate of repairs would have been and then watch it got torn out in a relatively short time frame."

28.    Tank barge RTC 502 sustained damage on its port side in this allision. The damage to the tank barge has been repaired (Stipulated Facts). Defendant's damage as result of the allision was in the amount of $40,000.

29.    The Chelsea Street Bridge was struck in September, 2000 by a barge and again by another barge on December 8, 2002, and thereafter on at least two occasions.

30.    The City of Boston engaged consulting engineers BSC Group to determine the extent of the damages caused by the various allisions occurring from September 8, 2000 forward. BSC Group had prior experience in assessing bridge damage for the City of Boston, and had most recently, through its sub-contractor Vollmer Associates, been involved in repair damages to the Chelsea Street Bridge caused by oil tanker PAGODA. The repair project arising out of the PAGODA allision was supervised from an engineering prospective by Vollmer Associates.

31.    Employees of Vollmer Associates surveyed the damage allegedly caused by the RTC 502 allision on or about December 5, 2000 and determined preliminarily that damage in the approximate amount of $100,000 had occurred. Employees of Vollmer Associates also inspected the subsequently occurring damage to the Chelsea Street Bridge on December 8, 2000. By early January, 2001, Vollmer Associates issued

reports indicating that the damage from the two incidents could be repaired for approximately $135,000, which it identified as a "low" estimate. Vollmer Associates provided alternative estimates which increased this $135,000 estimates by arbitrary multiples of 1.4 %, which they then compounded arbitrarily by 1.5% (Trial Exhibit 40). The result was that Vollmer's initial estimates concluded the damage could be repaired for the sum of $135,000 to $284,000 (Trial Exhibit 40).

32.    On February 1, 2001, Vollmer issued a report indicating that its estimate for the repair of the damages caused by the incidents occurring on December 2, 2000 and December 8, 2000 was $290,000 (Trial Exhibit 46). The body of the report containing this estimately, however, contained Vollmer's opinion that it was possible that the damage occurring during the December 2, 2000 allision could be repaired without raising the bridge during the repairs. The $290,000 estimate, however, assumed that repairs would take place with the bridge raised. No estimate except for the initial "low estimate" of $135,000 was prepared for repairs being performed without the bridge being raised, which would eliminate numerous significant costs, including costs of a barge and tug boat, police, signage, etc., during repairs.

33.    After Vollmer issued the February 1, 2001 report, however, the City of Boston, by way of its consultants BSC and Vollmer, engaged in an exercise of re-doing repair estimates numerous times, with the result that the purported estimates changed repeatedly, and drastically. In May, 2002, Vollmer issued a revised estimate that claimed the repairs from the December 2, 2000 allision, alone, would cost $399,000 to repair (Trial Exhibit 70). In 2006, the City of Boston issued another estimate indicating

that the cost of repairing the damage would be $750,000 (Trial Exhibit 76). Review of these estimates reveal that they are so disparate so as not to represent sound or realistic estimates of alleged damages.

34.    In addition to the estimates of plaintiff's engineers lacking indicia of reliability, plaintiff never introduced evidence, including bids, from any bridge repair contractor as to the cost of repairing the bridge. No bids were obtained because the City has never intended to repair the damages allegedly caused in the December 2, 2000 allision.

35.    Defendants have submitted expert testimony through an engineering concern, GV Engineering, that repair of the claimed damage arising out of the December 2, 2000 allision would be cost $75,000 in 2000 dollars. In addition, evidence in this case establishes that the fendering system was not designed to protect against damage that would be caused by a light barge alliding with the bridge.

36.    There is no evidence establishing that the value of the Chelsea Street Bridge was diminished by the allision of December 2, 2000.  There is no evidence that the City of Boston has, or will, spend any sums of money repairing any of the damage to the bridge claimed in this law suit. The only repairs affected by the City of Boston following the allision in question was to tie up some broken wooden members of the walkway of the bridge with rope. There was no evidence of any expense incurred by the City in effectuating this repair.

## PROPOSED CONCLUSIONS OF LAW

37.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. 1333.

38.    Federal maritime law applies in resolving the issues presented in the instant dispute between the parties. *In re Amtrak Sunset Ltd. Train Crash in Bayou Canot, Ala. on Sept. 22,* 121 F.3d 1421 (11th Cir. 1997); *Palumbo v. Boston Tow Boat Co., Inc.* 21 Mass.App.Ct. 414, 487 N.E.2d 546 (Mass.App.,1986);  46 U.S.C. § 740 (1975).

39.    "The right of navigation on the waterways of the United States is paramount to the right of a bridge spanning the navigable waterway." *Folkstone Maritime, Inc. v. CSX Corp.*, 64 F.3d 1037 (7th Cir. 1995).

40.    A bridge spanning a navigable river is an obstruction to navigation tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary, the right of navigation being paramount. *Folkstone Maritime, Inc. v. CSX Corp.*, 64 F.3d 1037 (7th Cir. 1995); *Clement v. Metropolitan W. Side Elec. Ry.,* 123 F. 271, 273 (7th Cir.1903). Indeed, no bridge shall at any time unreasonably obstruct the free navigation of any navigable waters of the United States. 33 U.S. C. § 512. "Obstruction," as it applies to this case means "anything that restricts, endangers or interferes with navigation. 33 C.F.R. § 64.06.

41.    Generally, admiralty law presumes that, when a vessel under its own power allides with a fixed structure, the burden of proving absence of fault rests with the

moving vessel. *The Oregon,* 158 U.S. 186, 192-93, 15 S.Ct. 804, 806-08, 39 L.Ed. 943 (1895). This presumption, commonly referred to as "The Oregon Rule," derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way." *Wardell v. National Transp. Safety Bd.,* 884 F.2d 510, 512 (9th Cir.1989). Generally, however, the moving vessel may rebut the presumption by showing that the allision was the fault of the stationary object, that the moving ship acted with reasonable care, or that the allision was an unavoidable accident. *Brunet v. United Gas Pipeline Co.,* 15 F.3d 500, 503 (5th Cir.1994); *Cliffs-Neddrill Turnkey Int'l-Oranjestad v. M/T Rich Duke,* 947 F.2d 83, 86 (3d Cir.1991). If the vessel's contact with the stationary object is "expected" or "minor," the presumption is not applied unless that contact rises "above a certain minimal level." *See American Petrofina Pipeline Co. v. M/V Shoko Maru,* 837 F.2d 1324, 1326 (5th Cir.1988) (recognizing that slight damage to a fender system during "normal docking" may fall outside the purview of the presumption) (collecting cases); *Manufacturers Rys. Co. v. Riverway Harbor Serv. St. Louis,* 646 F.Supp. 796, 798 (E.D.Mo.1986) (same).

42.    The presumption pursuant to *The Oregon* Rule has been treated by courts alternatively as a rule governing the burden of persuasion [*See Pennsylvania R.R. v. S.S. Marie Leonhardt,* 320 F.2d 262, 264 (3d Cir.1963), holding presumption disappears when both sides fully presented testimony regarding their version of what happened prior to the collision or the burden of proof], and as a rule governing burden of proof [*See Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790, 795 n. 3 (5th Cir.1977), holding that the presumption affects the burden of proof, *cert. denied,* 435

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004
(212) 422-6111

U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978; b*ut cf. S.C. Loveland, Inc. v. East W. Towing, Inc.,* 608 F.2d 160, 165 n. 3 (5th Cir.1979), citing *Pennsylvania R.R. v. S.S. Marie Leonhardt,* 202 F.Supp. 368, 376 (E.D.Pa.1962) with approval and remarking that "any presumption that a moving vessel colliding with a fixed portion of a bridge is negligent disappears when evidence is presented"), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980)]. Regardless of how treated, however, the presumption of *The Oregon* must be applied in a "common sense" manner that is rooted in "logic and experience." *Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790, 794 (5th Cir.1977), *cert. denied,* 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978); *Folkstone Maritime, Inc. v. CSX Corp.,* 64 F.3d 1037 (7th Cir. 1995).

43.    Evidence that a bridge was determined by the United States Coast Guard pursuant to Truman Hobbs Act, 33 U.S.C. 33 U.S.C. §§ 511 – 524, to constitute an "unreasonable obstruction to navigation" may be considered by the finder of fact. *Union Pacific R. Co. v. Kirby Inland Marine, Inc. of Mississippi,* 296 F.3d 671 (8th Cir. 2002).; *I&M Rail Link, LLC. v. Northstar Navigation, Inc.,* 198 F.3d 1012 (7th Cir. 2000).

44.    "Any obstruction to navigation is unlawful, since the public is entitled to the unobstructed use of every part of a navigable river." *U.S. v. Norfolk-Berkley Bridge Corp.,* 29 F.2d 115 (D.Va. 1928); *Georgetown v. Alexandra Canal Co.,* 12 Pet. 97, 9 L.Ed. 1012; *Clement v. Metropolitan West Side El. Ry. Co.* 123 F.2d 271 (7th Cir. 1903).

45.    Where a bridge constitutes an unlawful obstruction to navigation the vessel which strikes it is not presumptively negligent or careless, but the bridge owner is presumptively at fault, unless the bridge owner can show that the failure to comply with

the requirements was not one of the factors or causes which contributed to the injury. *U.S. v. Norfolk-Berkley Bridge Corp.*, 29 F.2d 115 (D.Va. 1928). In such circumstances, the bridge owner is entitled to recover from the ship only if he can show that the failure to comply with the law was in no way responsible for or contributed to the accident or disaster. *Ibid.*; see also, *City of Boston v. SS TEXACO TEXAS*, 559 F. Supp. 1332 (D.Mass. 1984); *Board of Com'rs of Port of New Orleans v. M/V Agelos Michael*, 390 F.Supp. 1012, 1015 (E.D.La. 1974); In *William B. Patton Towing Company v. J.J. Spiller, Jr.*, 440 S.W.2d 869 (Tex. 1969). Where an allision occurs because of the improper presence and/or protrusion of a fixed structure in the navigable waterway, the owner of the structure is unable to establish the structure could not have contributed to the allision. *Ibid.*

46.    In addition, findings of the United States Coast Guard that a bridge constitutes an unreasonable obstruction to navigation under the Truman Hobbs Act may, in and of themselves overcome *The Oregon's* presumption of negligence and where a bridge has been found to violate the Truman Hobbs Act, in any law suit for damages resulting from an allision, the trier of act must resolve the matter without any resort to presumption pursuant to *The Oregon* against the vessel. *I&M Rail Link, LLC. v. Northstar Navigation, Inc.*, 198 F.3d at 1016.

47.    Under the federal maritime law, liability for allisions may be imposed even in the absence of a statutory violation, if negligence was involved. The test and standard for a finding of negligence is reasonable care under the circumstances, *see*

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004
(212) 422-6111

*Weyerhaeuser Co. v. Atropos Island,* 777 F.2d 1344, 1351 (9th Cir.1985), or whether, judged against the standard of good and prudent seamanship, the allision could have been prevented by the exercise of due care. *See The Jumna,* 149 F. 171, 173 (2d Cir.1906). Each case must be reviewed by considering the specific factual circumstances under which the accident took place. *See, e.g., The H.F. Dimock,* 77 F. 226, 229-30 (1st Cir.1896). It is not required that an extreme degree of caution or other more exacting standard of care be used; nor does error of judgment impute fault if it is within the ordinary care standard. *See The W.H. Baldwin,* 271 F. 411, 413 (2d Cir.1921).

48.    In addition, federal maritime law embodies a system of pure comparative fault as between the parties. *Ibid;* City of Chicago v. M/V MORAN, 375 F.3d 563 (7th Cir. 2004); *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); *Brotherhood Shipping Co. v. St. Paul Fire & Marine Ins. Co.,* 985 F.2d 383 (7th Cir. 1993). Accordingly, when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault. *United States v. Reliable Transfer Co., Inc. supra.* Even if it is determined that the bridge owner was not the cause of the allision, the court must assess whether the bridge owner's negligence was a proximate cause of damages alleged to have been caused by the allision. City of Chicago v. M/V MORAN, 375 F.3d 563. Thus, the finder of fact in assessing liability in an allision case where the Coast Guard has determined the bridge to constitute an unreasonable obstruction to free navigation must determine whether "the shortcomings of the bridge caused [the]

accident" *I&M Rail Link, LLC. v. Northstar Navigation, Inc.*, 198 F.3d 1012, 1016 (7th Cir. 2000) and/or resulting damages.

    49.   In the instant case, the Court determines that defendant is not liable for the allision occurring on December 2, 2000 as between barge RTC 502 and the Chelsea Street Bridge. The court finds based upon the evidence adduced at trial that the bridge constituted on the date of the allision an unreasonable obstruction to the free navigation of vessels on the Chelsea Creek, in particular RTC 502 being pushed by tug DACE. RTC 502 had a breath of 78 feet and was being pushed through the bridge with a horizontal span between its fenders of only 96 feet. In 1992 the United States Coast Guard, after investigation conducted pursuant to the Truman Hobbs Act, declared the Chelsea Street Bridge an unreasonable obstruction to the free navigation on the Chelsea Creek. The ultimate basis for this determination was that the horizontal span between the fenders of the bridge was too narrow as concerning prevalent commercial traffic in the Chelsea Creek. The Coast Guard, in reaching this finding, citing a high rate of allisions between vessels and the bridge and stated that the risk of allision due to the narrow span of the bridge was not acceptable. The Coast Guard's investigation revealed it was standard operating procedure for vessels to literally bounce off one of the bridge's fenders in order to make their way through the bridge. The City of Boston actually submitted evidence to the Coast Guard stated, in sum and substance, that future allisions were inevitable, and the City expressly accepted the findings of the Coast Guard that the bridge constituted an unreasonable obstruction to navigation. The findings of the Coast Guard as set forth in its report issued upon investigation under the Truman Hobbs Act were corroborated by evidence at trial. Evidence through the City's

witnesses established that allisions with the bridge continued to be commonplace and that it was standard operating procedure for vessels to come into contact with the bridge's fendering system while transiting the bridge. In all, the evidence at trial clearly established that the Chelsea Street Bridge constituted an unreasonable obstruction to the free navigation of the Chelsea Creek on December 2, 2000.

50.    Since the bridge by all accounts constituted an unreasonable obstruction to navigation at the time of the allision, plaintiff bore the burden of establishing it was in no way responsible for or contributed to the accident. *U.S. v. Norfolk-Berkley Bridge Corp.*, 29 F.2d 115 (D.Va. 1928); *City of Boston v. SS TEXACO TEXAS*, 559 F. Supp. 1332 (D.Mass. 1984); *Board of Com'rs of Port of New Orleans v. M/V Agelos Michael*, 390 F.Supp. 1012, 1015 (E.D.La. 1974). Plaintiff did not present proof exonerating itself from fault in the allision and it is clear that the basis for the bridge constituting an unreasonable obstruction to navigation, i.e. its extremely narrow width, was a contributing factor to the allision. Even if the issue of liability was evaluated otherwise the result would be the same. For example, the Court finds that the presumption of fault under *The Oregon* that may arise when a vessel strikes a stationary object shall not apply in this case, for several reasons. First, as of the date of the allision plaintiff had not complied with the Order to Alter of the United States Coast Guard issued after its finding that the bridge constituted an unreasonable obstruction to navigation. The Court finds that in fact the Chelsea Street Bridge did constitute an unreasonable obstruction to navigation on December 2, 2000. This evidence would negate any presumption of fault that may arise under *The Oregon*. Plaintiff, however, failed to prove at trial that the

allision occurred due to negligence on the part of defendant. Plaintiff's case for negligence in this case was merely that an allision occurred. However, and particularly under the circumstances of this case, the fact of an allision, alone, is insufficient to establish defendant breached the applicable standard of care. Accordingly, plaintiff has failed to establish a basis for liability against defendant for the allision of December 2, 2000 and the complaint is dismissed, with prejudice.

51.    Were there any basis for a finding of liability against defendant, and there is not, the Court would be compelled to find overwhelming comparative negligence on the part of plaintiff. Plaintiff maintained a bridge that was determined to be an unreasonable obstruction to the free navigation on the Chelsea Creek. Plaintiff was aware since at least as early as 1992 that the bridge was an unreasonable obstruction to navigation but did not alter the bridge, although having been ordered to do so by the Coast Guard. Plaintiff actually predicted further allisions would occur, which they did, and plaintiff City of Boston was necessarily the negligent cause of the allision of December 2, 2000.

## DAMAGES

52.    Courts in admiralty are authorized to grant equitable relief, including with respect to the type and quantum of damages awarded. *Weeks Marine, Inc. v. Picone, Inc.,* 1998 WL 717615 (S.D.N.Y. 1998). A federal court sitting in admiralty is not tied to any strict rules of the common law, but has the authority to make equitable decisions, considering all of the facts and circumstances of the individual case. *BP Exploration &*

*Oil, Inc. v. Moran Mid-Atlantic Corp.,* 147 F.Supp.2d 333 (D.N.J. 2001); *See, e.g., Standard Oil Co. v. S. Pac. Co.,* 268 U.S. 146, 156, 45 S.Ct. 465, 69 L.Ed. 890 (1925) ("It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts."); *The Atlas,* 93 U.S. 302, 312, 23 L.Ed. 863 (1876) ("Disasters of the kind occur from different causes and under very different circumstances, and the rules of admiralty law applicable in the determination of such controversies vary to meet the varying circumstances which give rise to the accident." ); *Pizani v. M/V COTTON BLOSSOM,* 669 F.2d 1084, 1089 (5th Cir.1982) (finding that a federal court sitting in admiralty has equitable powers, thus the common law was not controlling); *Gateway W. Ry. Co. v. Am. River Transp. Co.,* 887 F.Supp. 201, 202 (C.D.Ill.1995) ( "[A] court sitting in admiralty is privileged to exercise flexibility and award what is fair" (quotations and citations omitted); "A court of admiralty is, as to all matters falling within its jurisdiction, a court of equity. Its hands are not tied up by the rigid and technical rules of the common law, but it administers justice upon the large and liberal principles of courts which exercise general equity jurisdiction." (quotations and citations omitted)).    Damages that will result in an unjustified windfall to a party will be disallowed. *Weeks Marine, Inc. v. Picone, Inc.,* 1998 WL 717615 (S.D.N.Y. 1998).

52.    Plaintiff has the burden of proving the fact of damages suffered, the causation between defendant's acts and those damages, and the amount of damages to a "reasonable certainty." *Pinto v. M/S Fernwood,* 507 F.2d 1327 (1st Cir.1974); *Diesel Tanker Ira S. Bushey, supra.* Collision damages must be proven; courts are not permitted to speculate. *Tanker Hygrade No. 24 v. Dynamic,* 233 F.2d 444 (2d Cir.1956);

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004
(212) 422-6111

21

*Sinclair Refining Co. v. American Sun,* 188 F.2d 64 (2d Cir.1951); *Turecamo Maritime, Inc. v. Weeks Dredge No. 516,* 872 F.Supp. 1215 (S.D.N.Y. 1994).

53.     Where damages are susceptible of precise proof, or of estimation by those having knowledge, or are capable of proof with certainty, such proof must be adduced. Ragen Corp. v. Kearney & Trecker Corp., 912 F.2d 619 (3rd Cir. 1990); *Maslow Cooperage Corp. v. Weeks Pickle Co.,* 270 Wis. 179, 70 N.W.2d 577, 583 (1955).

54.     As noted, courts in admiralty will not award damages where to do so would result in a "windfall." *Weeks Marine, Inc. v. Picone, Inc.,* 1998 WL 717615 (S.D.N.Y. 1998).    A windfall will   occur where damages are awarded under circumstances where estimates for repairs establish the basis for an award of damages but the repairs have not been perform nor are they planned to be performed. *In re Westminster Associates, Ltd.,* 285 B.R. 38 (Bkrtcy.M.D.Fla. 2002)(recovery of damages sought denied on grounds it would represent a "substantial windfall" where repairs neither effected nor planned to be effected." *See also Ceres Terminals, Inc. v. Chicago City Bank and Trust Co.,* 259 Ill.App.3[d] 836 (Ill App. 1 Dist. 1994).

55.     The standard measure of damages for property damage is diminution in value of the property as a result of the accident. *Massachusetts Port Authority v. Sciabba Construction Corp.,* 54 Mass.App.Ct. 509 (2002). Where diminution of value may not properly value the damage for courts may consider other evidence, such as repair or replacement cost. *Ibid.* However, where such measure of damages is considered:

> "care must be taken, if possible, not to permit the injured party to recover more than is fair to restore him to his position prior to his loss. He should not recover a windfall. We are well aware of the danger that evidence of repair or replacement costs 'may lead to an excessive award unless [they

are] ··· *adequately* discounted for obsolescence and inadequacy as well as for physical depreciation' (emphasis in original). *Ibid*; *Commonwealth v. Massachusetts Turnpike Authy.*, 353 Mass. 143, 148 (1967).

56.     The owner of a marine structure is only entitled to an award that would provide a structure as "practically serviceable as before" the allision and not to an award, often much larger, sufficient to restore" the structure to the identical condition before the injury. Indeed:

> "… where an injury can be perfectly repaired for all practical uses at slight expense, but, as in this case, cannot be placed in exactly the same condition as new, except by taking out and replacing much other good work at a very considerable expense, the court must hesitate in allowing damages on the basis of the latter mode of repair, especially where, as in this case, though a long time has elapsed, no such repair has been made." *RGZ, Inc. v. McAllister Brothers, Inc.*, 1989 WL 108244 (E.D.Pa.).

In such circumstances, the proper measure of damages is an aware of sums expended by the injured party to actually repair the structure to make it serviceable, as well as any necessarily incurred costs, such as surveyor's fees. *Ibid. Petition of Metropolitan Sand & Gravel Corp.*, 170 F.Supp. 675 (S.D.N.Y. 1958); *Bleakley Transportation Co. v. Colonial Sand & Stone Co.*, 245 F.2d 576 (2nd Cir. 1957); *Zeller Marine Corp. v. Nessa Corp.*, 166 F.2d 32, 33 (2nd Cir. 1948).

57.     Where repair estimates are properly used as a measure of damages, recoverable damages are limited to the cost of repairs at the time of the allision. *Kansas City Southern Railway Company v. BARGE HBC 8106*, 642 F. Supp. 609 (W.D.La. 1986).

58.     Where repairs are not effectuated and not money is expended by plaintiff, prejudgment interest is not permitted, since an award of interest is made as

····, ········ · ········
26 Broadway
New York, New York 10004
(212) 422-6111

compensation for the deprivation of the use of money or property and where there has been no such deprivation, interest may not be awarded. *Utility Service Corp. v. Hillman Transp. Co.* ,244 F.2d 121 (3rd Cir. 1957); *The Manhattan*, 10 F.Supp. 45, 49 (E.D.Pa. 1935), *affirmed*, 3 Cir., 1936, 85 F.2d 427, *certiorari denied, United States v. The Bessemer*, 1937, 300 U.S. 654, 57 S.Ct. 432, 81 L.Ed. 864; *The Wright,* Wright, 109 F.2d 699 (2nd Cir. 1940); *The Hygrade No. 24 v. The Dynamic,* 233 F.2d *444* (2nd Cir., 1956).

59.    In the instant case, plaintiff has failed to prove damages with the requisite degree of certainty. Plaintiff has failed to establish the fair market value of the Chelsea Street Bridge at the time of the allision and also accordingly failed to establish the allision resulted in any diminution in value of the bridge. Plaintiff has attempted to establish a measure of damages caused by the allision based upon estimates of repair of said damage. However, plaintiff's repair estimates of damages allegedly caused by the December 2, 2000 were so inconsistent it is apparent plaintiff did not engage in a good faith estimate to calculate alleged damages. Indeed, plaintiff's repair estimates ranged from preliminary estimates for repair of damages from two separate allisions, i.e. December 2, 2000 and December 8, 2000, in the amount of $135,000, to an estimate for the repair of damages from the December 2, 2000 allision in the amount of $750,000. Plaintiff is unable to establish with any degree of certainty the amount of damages it allegedly suffered by resort to repair estimates.

60.    It must be noted that even if plaintiff's repair estimates could be accepted as valid, in the circumstances of this case they do not establish the appropriate measure of damages. Plaintiff did not affect any repairs to the Chelsea Street Bridge

as a result of the December 2, 2000 except to secure some of the broken members of the walkway of the bridge with rope. There was no expense incurred by the City in doing this. The Chelsea Street Bridge following the allision remained fully operable. Repairs were not effectuated to the Chelsea Street Bridge by the City of Boston because it was aware that the bridge would soon be razed and rebuilt with funding provided by the Commonwealth of Massachusetts, with no expense to the City of Boston. Thus, plaintiff made a conscious decision not to expend funds to repair the bridge, which was at all times fully operable and usable, knowing such an expenditure was neither necessary nor prudent given the replacement of the bridge. To award the City of Boston any damages, especially damages representing purported repair costs which it will never expend, would cause an improper windfall to the City of Boston and would be inequitable.

61.    Finally, defendant has introduced credible evidence establishing that the cost of repairing the damages actually caused by the allision of December 2, 2000 would be in the amount of $75,000. Again, since inequitable to award any damages under the circumstances presented in this case no award is made, in any event damages would be capped at the sum of $75,000. Obviously since the City of Boston has not expended any sums as a result of the allision,  an award of interest would be inappropriate.

Kenny, Stearns & Zonghetti
26 Broadway
New York, New York 10004
(212) 422-6111

Dated: January 16, 2007

Kenny, Stearns & Zonghetti
Attorneys for Defendant
Reinauer Transportation Companies

By: _____
Gino A. Zonghetti
(BBO # 663120)

To:     John J. Finn, Esq.
        Finn & Finn
        34 Chamberlain Street
        Hopkinton, MA  01748
        (508) 497-5019